**Anand SINHA, Ph.D., Plaintiff,**

**v.**

**The STATE UNIVERSITY OF NEW YORK AT FARMINGDALE, Anna Senyk, Frank A. Cipriani, and Michael J. Vinciguerra, Defendants.**

**No. CV 85–3734 (ADS).**

United States District Court,
E.D. New York.

June 10, 1991.

**766**

Joseph A. Miller, III, West Sayville, N.Y., for plaintiff.

Robert Abrams, Atty. Gen. of State of N.Y., New York City by Martha O. Shoemaker, Charles C. Davis, Jr., Asst. Attys. Gen., for defendants.

## MEMORANDUM AND ORDER

SPATT, District Judge.

The issues in this case concern a charge of discrimination in the setting of a college faculty. The plaintiff, an Assistant Professor at the State University of New York at Farmingdale, contends that he was denied promotion because of his Indian national origin and because he is a male.

### BACKGROUND

This action alleging employment discrimination, was brought claiming violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and alleging causes of action under 42 U.S.C. §§ 1981 and 1983. On February 25, 1987, the Hon. Mark A. Costantino granted partial summary judgment dismissing the §§ 1981 and 1983 causes. This bench trial concerned solely the Title VII claims.

Initially, the Court notes that most of the facts in this case are undisputed and supported by documentary evidence. It is the inferences and nuances that flow from this undisputed evidence that require judicial factual finding.

The plaintiff Anand Sinha is East Indian by descent. He was educated in India and the United States. He received a Bachelor of Science degree in 1954; a Master's degree in Political Science in 1956; a second Master's degree in Mass Communications at Syracuse University in 1963; a third Master's degree in Philosophy at Columbia University; and a Doctor of Philosophy degree, described by the plaintiff as a "joint degree in communications and sociology," from Columbia University in May, 1977.

In 1974 he was first employed at the State University at Farmingdale ("Farmingdale") as an Adjunct Professor. Since that time he remained at Farmingdale, rising to an Assistant Professor in 1977. He has not been promoted since that time.

### THE CONTENTIONS

Even though eleven witnesses testified at this trial and eighty-six exhibits were

admitted into evidence, the contentions and issues are relatively simple.

The plaintiff contends that he was discriminated against by being denied promotion to the rank of Associate Professor from 1979 to the present time by reason of the fact that he is a male minority (Indian–Asian descent) member of the Department of Sociology and Anthropology under the Chairmanship of Ann Senyk "... not only by virtue of sex, but also by reason of nation origin and race ..." (Verified Complaint [the "Complaint"], ¶ 21). The plaintiff further contends that for the same discriminatory reasons he was deprived of certain "discretionary monies" and the right to teach at evening school and summer school at Farmingdale.

On the other hand, the defendants deny that any discrimination occurred and contend that the plaintiff was not promoted because he was unqualified for promotion due to certain deficiencies in the performance of his duties as an Assistant Professor concerning, among other things, his lateness for classes, absences from classes and failure to timely submit the grades of his students.

### THE LEGAL STANDARDS IN A TITLE VII CASE

■ "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) makes it an unfair employment practice for an employer to discriminate against any individual with respect to ... the terms and condition of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate or classify his employees in ways that would adversely effect any employee because of the employee's race, color, religion, sex, or national origin." (*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 2118, 104 L.Ed.2d 733 [1989]; *Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1146 [2nd Cir.1991]). A claim of sexual discrimination brought by a male plaintiff is cognizable under Title VII, since the word "sex" in Title VII simply "refer[s] to membership in a class delineated by gender" (*DeCintio v. Westchester County*

*Medical Center*, 807 F.2d 304, 306 [2d Cir. 1986], *cert. denied*, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 [1987]).

■ "Two distinct theories of liability have evolved under Title VII, the first commonly known as 'disparate treatment,' the second as 'disparate impact.' Under the first theory, 'proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.' Under the second theory, plaintiff may prove his case by establishing that his employer maintained a policy or practice that, although fair in form, resulted in a disparate impact upon a special minority." (*Sousa v. Hunter*, 739 F.Supp. 756, 759 [E.D.N.Y.1990] [quotations and citations omitted]). In this action, the plaintiff alleged a "disparate treatment" Title VII claim. (*See* Complaint, ¶ 20) A claim of disparate treatment, by reason of failure to promote, is actionable under Title VII. (*See Sousa v. Hunter, supra*, 739 F.Supp. at p. 759 [citing *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 [1988]]).

■ Disparate treatment "is established under Title VII by proof that plaintiff[ ] was treated less favorably than others solely because of [his] race, color, religion, sex or national origin." (*Zahorik v. Cornell University*, 729 F.2d 85, 91 [2d Cir.1984]). As stated, to establish a discriminatory treatment claim under Title VII, proof of discriminatory motive is "critical". Discriminatory motive can be proved by direct or circumstantial evidence, though most often a Title VII plaintiff "is usually constrained to rely on the cumulative weight of circumstantial evidence" (*Rosen v. Thornburgh*, 928 F.2d 528, 533 [2d Cir. 1991]).

A Title VII claim, including one alleging discriminatory treatment, is tried by a three-step process (*see Woodbury v. New York City Transit Authority*, 832 F.2d 764, 769 [2d Cir.1987]). The United States Court of Appeals for the Second Circuit summarized how a Title VII trial is to proceed as follows:

"The Supreme Court fashioned the manner in which a Title VII action is presented by establishing the now familiar pattern of shifting burdens of proof. Complainant has the initial burden of proving a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for its action and, finally, complainant must show that the employer's stated reason was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). Once the employer satisfies its burden of production, the inquiry moves to 'a new level of specificity,' where the plaintiff has the burden of persuading the court 'that the proffered reason was not the true reason for the employment decision.' *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 1094–45, 67 L.Ed.2d 207 (1981). The plaintiff may carry this burden 'directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Id.* at 256, 101 S.Ct. at 1095." (*Ibrahim v. New York State Dept. of Health*, 904 F.2d 161, 165–66 [2d Cir. 1990]).

Employing this three-part test, the plaintiff must first establish a *prima facie* case by proving the following factors: (1) he is a member of a protected class; (2) he applied for and was qualified for the position for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications (*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 [1973]; *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 161 [2d Cir.1991]; *Rosen v. Thornburgh, supra*, 928 F.2d at p. 532).

While these factors are not necessarily applicable "in every respect to different factual situations" (*McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at p. 802 n. 13, 93 S.Ct. at p. 1824 n. 13), they "promote

the general principle that a Title VII plaintiff must carry the initial burden of offering evidence adequate to raise [ ] an inference of discrimination" (*Meiri v. Dacon*, 759 F.2d 989, 996 [2d Cir.1985] [quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 [1978]], *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 [1985]). (*Accord Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 [1977]).

Once the plaintiff establishes a *prima facie* case, the defendant must "produce" "some" legitimate, non-discriminatory reason for its action—in the instant case, for its failure to promote. (*See Rosen v. Thornburgh, supra*, 928 F.2d at p. 532; *Ibrahim v. New York State Dept. of Health, supra*, 904 F.2d at p. 166).

Finally, under the third step of the analysis, the plaintiff must satisfy his ultimate burden, by a fair preponderance of the credible evidence (*see Villanueva v. Wellesley College*, 930 F.2d 124, 129 [1st Cir.1991]; *Rosen v. Thornburgh, supra*, 928 F.2d at p. 532; *Sweeney v. Research Foundation of the State University of New York*, 711 F.2d 1179, 1187 [2d Cir. 1983]), that the defendants' stated reason(s) for their actions was pretextual. (*Cf. Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 [2d Cir.1991] [quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 [1981]] [" 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff' "]).

"Ultimately, the trial court must decide the question of whether the employer intentionally discriminated against the plaintiff—i.e., it must determine 'whether the defendants' purported business reasons are actually such.' " (*Ibrahim, supra*, 904 F.2d at p. 166 [quoting *Gibson v. American Broadcasting Co., Inc.*, 892 F.2d 1128, 1132 [2d Cir.1989]]). "[P]retext can be established by a showing that the 'asserted neutral basis was so ridden with' error that the employer obviously could not honestly

have relied on it" or by showing that the reason advanced by the defendant "was unworthy of credence" (*Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1113 [2d Cir.1988] [quotation omitted]; *but see Lopez v. Metropolitan Life Ins. Co., supra*, 930 F.2d at p. 161 ["it is enough for th⌐ plaintiff to show that the articulated reasons were not the true reasons for the defendant's actions"]).

\*　　\*　　\*　　\*　　\*　　\*

Having outlined the appropriate framework for the trial of plaintiff's Title VII claim, the following constitutes the Court's review of the evidence, findings of fact and conclusions of law (*see* Fed.R.Civ.P. 52[a]).

## FINDINGS OF FACT: THE PLAINTIFF'S PRIMA FACIE CASE

The plaintiff, Dr. ANAND SINHA, testified that in 1977 when the plaintiff was appointed to the position of Assistant Professor, defendant Anna Senyk, the Chair of the Sociology–Anthropology Department ("Soc–Anthro Dept"), supported his appointment. That same year, the Soc–Anthro Dept was split off from the larger Behavioral Sciences Department. At that time the makeup of the newly formed Soc–Anthro Dept was four females, including Chair Senyk, and a "minority" of three males, the plaintiff, Dr. Monte Rivera and Professor George Sweeney.

Plaintiff went to India on a visit in December 1977 and asked Professor Senyk to safeguard his office. When he returned in January 1978, his office had been moved and certain records were missing.

Also in 1977, the plaintiff was elected President of the New York State Sociological Association, and he hosted a meeting of the Association at Farmingdale in October 1978. Since attendance was less than anticipated, the plaintiff had to personally contribute $700 to the cost of the convention.

In 1979, the plaintiff applied for promotion to the position of Associate Professor. On the "merit" promotion list the plaintiff was listed thirteenth of the fourteen candidates. Among the candidates for promotion in the Soc–Anthro Dept, he was number two behind Professor Rose Oldfield–Hayes and ahead of Professor Mary Kirby Diaz. When the list was reviewed by the college-wide promotion committee, the name of Professor Hayes was removed. The President of Farmingdale has the sole power to promote. In 1979, the plaintiff was not promoted.

On the May 1980 candidates list for promotion, the plaintiff was listed as the fourth candidate out of twelve. Since candidate number three left the college, in effect, the plaintiff was candidate number three on the promotion list. The asterisk placed after the plaintiff's name indicated that the plaintiff was a "carryover" from the prior year's list. Under the procedure then in existence, all carryovers were automatically placed in a higher position than other candidates on the list, regardless of merit. Therefore, if such a carryover is number one on the list, it does not mean that the promotion committee found him number one on the merits. In fact, the qualifications of a carryover was not reviewed at all.

The plaintiff testified that he spoke to the President of the college, Dr. Frank A. Cipriani, in October 1980 and was advised that no funds were then available and if funds were available, President Cipriani would "consider him" for promotion in January 1981.

During this time the plaintiff gained tenure and was also teaching in the evening classes of the college.

The plaintiff testified that the first student complaint against him occurred on the Spring of 1981. He had made a visit to India in December 1980 for three weeks and returned in January, 1981. The plaintiff stated that some of the students' grades disappeared "because someone took them out of Dr. Naseem's mailbox" and that the students received their grades "orally" before he left for India. He admits, however, that the students did not receive their grades in writing until January 22, 1981. The plaintiff acknowledged that this episode displeased Dr. Cipriani,

who told the plaintiff that his tenure was in question because of his failure to timely give the students their grades.

On the promotion list dated May 29, 1981, the plaintiff was number one on the list as a carryover (asterisk). On September 11, 1981, the entire list of candidates were promoted, except the plaintiff. He spoke to Dr. Cipriani in November 1981, who told him that "I find it difficult to promote you" because of the student grade situation and also because "you don't work with women faculty members." He further testified that Dr. Cipriani told him that Professor Senyk advised Dr. Cipriani that "as an Indian, he has difficulty working with women."

At a department meeting chaired by Professor Senyk, the plaintiff testified that Dr. Rose Hayes called him a "Goddamn Indian" who "should be eliminated". He stated that he was also called a "Goddamn liar" at another departmental meeting.

On the October 5, 1982 promotion list, the plaintiff remained number one as a carryover (asterisk). Again, all of the candidates were promoted except him.

The plaintiff's name did not appear on the May 21, 1983 promotion list; nor on the September 11, 1984 promotion list; and was not on the May 20, 1985 promotion list. During 1983, 1984 and 1985 there were no carryovers on any of the lists.

On the June 1, 1987 promotion list, the carryovers reappeared. The August 25, 1988 promotion list contained carryovers in all ranks. The plaintiff's name was not on this list. The June, 1989 promotion list also contained carryovers with asterisks; again, the plaintiff's name was not on this list.

The plaintiff further testified that in the Fall of 1988, he was told that he could no longer teach evening college classes. He was also excluded from teaching at the summer school.

The proof revealed that the plaintiff's salary as an Assistant Professor was lower than any of his colleagues in the Soc–Anthro Dept. Of course, if he had been promoted to Associate Professor, his salary would have increased.

Incidents occurred late in 1983 which resulted in a disciplinary proceeding being lodged against the plaintiff. On September 17, 1983 he received a telegram that his mother was critically ill. He advised Chair Senyk who, according to plaintiff, permitted the plaintiff to leave for India. He returned in October 1983. On November 1, 1983, he received a telegram that his mother had died. After a thirty-day mourning period he left for India on November 30, 1983 and returned on January 5, 1984. He did not have permission to leave from the Dean of the School of Arts & Sciences, Dr. Robert V. Mark. A disciplinary proceeding was brought against him, charging him with leaving his classes without completing the course work. The plaintiff contends that this disciplinary proceeding was brought against him by reason of discriminatory conduct. He further testified that in his absence Professor Senyk solicited complaints against him from his students.

The plaintiff testified that he filed a complaint with the New York State Division of Human Rights on April 1, 1982 because the college administration was not doing anything to prevent discrimination against male Indian professors. He received a "right to sue letter" on July 19, 1985 and filed the complaint in this action on August 29, 1985.

As to his alleged salary loss, the plaintiff testified that in 1990 he earned $31,697 as an Assistant Professor and the average or median salary of other professors was $49,514, a difference of $17,817.87 per year. The plaintiff further offered proof that the Assistant Professors promoted in 1981 are now averaging $43,228 which is $11,531.20 greater than his salary. The professors promoted in the 1982 promotion list, who are now all full professors, averaged $54,000 at the present time, which is $22,303 more than his salary.

In addition, the plaintiff testified that he was deprived of "discretionary monies", which are monies allocated to faculty members in addition to their salaries to cure salary inequities and to foster creative con-

duct. During the years 1979 to 1990, he received discretionary money only once, in 1987. He further stated that "females did better in discretionary payments."

Finally, the plaintiff stated that as of 1990, in the Soc–Anthro Dept, the males are no longer a minority since there are four males and three females.

On cross-examination, the plaintiff admitted that "Dr. Hayes and I once were friends" but thereafter quarreled and there was animosity between them. In fact, in 1979 he tried to have Dr. Hayes removed from the promotion list and succeeded. Dr. Hayes was eliminated from the promotion list and thereafter left the faculty. The Court finds this conduct on the part of the plaintiff contributed to harsh feelings between the plaintiff and Professor Hayes, unrelated to his sex or national origin.

It was also brought out on cross-examination that the plaintiff made only one formal application for promotion, and that was in 1979. During the years he was a "carryover" on the list, oddly, the plaintiff never made another application for promotion. In fact, on the October 12, 1983 ballot for election to the Departmental promotion committee, (Defendant's Exhibit AA), there is a handwritten notation by the plaintiff stating the following:

"I would appreciate it if you would reconsider this ballot to include my name since I am not opting to apply for promotion.

Thank you
Anand Sinha".

Dr. MONTE RIVERA testified in support of the plaintiff's claim of discrimination against males. He was first employed at Farmingdale in September 1976, shared an office with the plaintiff and knows his work. Dr. Rivera stated that "it was unheard of for someone on the carryover list not to be promoted".

Dr. Rivera testified that prior to the time Professor Senyk became chair of the Soc–Anthro Department, the faculty members were more "adhesive". After Professor Senyk was appointed Chair, male members—who were in the minority—were not advised of certain matters which were disclosed only to the female faculty members. For example, Dr. Rivera stated that he didn't get the departmental appraisals until after the females. He told of a stormy departmental meeting at which time there was a conflict between the plaintiff and two females, and Professor Mary Kirby Diaz took off her shoe and banged it on the table. Dr. Rivera testified that he and the plaintiff "became targets" and that the female faculty members received all the rewards. He also stated that Dr. Rose Hayes said "Goddamn Indian", referring to the plaintiff.

Dr. Rivera said that the Department Chair decided who received "discretionary money" and that, in his department, the females were favored. In sum, he accused Professor Senyk of favoritism toward the female faculty members of the department and lack of sensitivity to minorities.

On cross-examination it was revealed that Dr. Rivera had been promoted to Associate Professor in September 1983. In April 1985 he applied to become Department Chair but, instead, Professor Senyk was appointed. After he was denied elevation to Chair, Dr. Rivera complained to the Suffolk County Human Rights Commission, but subsequently withdrew the charge.

ROBERT S. REGANSE is an Adjunct Professor of History at Farmingdale and Chapter President of the faculty union. He testified that Professor Sweeney, the senior faculty member in the Soc–Anthro Department, who had a brain ailment, told him that he had been discriminated against as a male and that the Department was divided into two camps, with Professor Raymond D. Dunstan, a male, in—between the two camps. Professor Reganse reviewed the incident of the absence from school by the plaintiff following his mother's death in 1983. He testified that he thought the college's treatment of the plaintiff on that occasion was grossly insensitive.

In 1988, the plaintiff was prevented from teaching in the Evening School. When Professor Reganse inquired as to the rea-

son, he was told that the school authorities "were not happy with [the plaintiff's] attendance." Professor Reganse recalled only two other cases where full time professors with seniority were not permitted to teach evening classes.

Professor Reganse also testified with regard to a letter received by the plaintiff dated January 18, 1991, ordering him to report to the Dean before and after every class and every office hour (see Plaintiff's Exhibit 18). He stated that he had never heard of such a measure. Also, the plaintiff received a letter of discipline dated January 31, 1991 for failing to report to the Dean's office. Professor Reganse testified that these procedures were a departure from custom and practice involving the treatment of professors.

Professor MAURO ZULLI had been the Vice President of Academic Affairs from 1973 to 1983, when he returned to full time teaching. He reviewed the promotion procedure at Farmingdale. The President of the College has the sole authority to promote on the basis of lists of recommended candidates. In 1983 the carryover procedure was modified so as to eliminate carryover candidates who applied once and remained on the list in perpetuity. This change was initiated to provide a greater merit selection emphasis to the promotion process by compelling candidates to apply and be reviewed each year. Although Professor Zulli testified on direct examination that the plaintiff's name was the only one not carried over, during cross-examination he conceded that the name of another faculty member, Professor Kostanowski, a white male, was also deleted.

At the conclusion of the plaintiff's case, the Court made a determination on the record that the plaintiff had established a prima facie case of discrimination. The plaintiff established, by a fair preponderance of the credible evidence, that (1) the plaintiff belongs to a minority, namely, a male of Indian descent; (2) he applied for and was qualified for a position which the employer was seeking applicants, namely, the position of Associate Professor for which he applied in 1979; (3) despite his

qualification for the position, he was repeatedly not promoted; and (4) after his rejection, the position had vacancies and the employer continued to seek applicants from persons with the same or inferior qualifications of the plaintiff (see Meiri v. Dacon, supra, 759 F.2d at p. 995; Rosen v. Thornburgh, supra).

As a result, the burden of going forward shifted to Farmingdale, the employer, to articulate a legitimate, non-discriminatory reason(s) for its failure to promote the qualified plaintiff to Associate Professor.

## FINDINGS OF FACT: THE NON–DISCRIMINATORY REASONS FOR THE FAILURE TO PROMOTE THE PLAINTIFF

By an array of witnesses and voluminous documentary evidence, the defendants have established a number of non-discriminatory reasons for the failure to promote the plaintiff.

These non-discriminatory reasons were substantiated by the testimony of the plaintiff himself, Professor Mauro Zulli, the then Vice President of Academic Affairs, Professor Anna Senyk, former Chair of the Soc–Anthro Department, Professor Raymond D. Dunstan and Professor Mary Kirby Diaz, members of the Soc–Anthro Department, Professor Christine Lovizio, the present Chair of the Soc–Anthro Department, Dr. Frank A. Cipriani, President of Farmingdale, Dr. Michael J. Vinciguerra, Provost of Farmingdale and Dr. Robert V. Mark, Dean of the School of Arts & Sciences of Farmingdale, as well as a plethora of exhibits in support of such testimony.

### 1. The Barbara Wasmuth Grievance

On July 2, 1980, the plaintiff's student Barbara Wasmuth took a makeup examination, but the plaintiff failed to turn in her grade. Without this grade, she was given an "I" (Incomplete) for her final grade. Unless the "I" was changed, it would be automatically converted to an "F", failure for the course. Ms. Wasmuth complained to Chair Senyk who consulted the plaintiff, who merely "shook his shoulders". The

student called for her grade again and again without response by the plaintiff.

The student then filed a grievance against the plaintiff. On March 27, 1981, the Review Committee issued its recommendation as to the grievance, as follows:

"When Miss Wasmuth took the makeup exam and turned in her written report on July 2, she had every reason to believe that she had completed the course requirements. The committee unanimously agreed that because of the unreasonable length of time that it has taken for Dr. Sinha:

1) to mark the last exam and written report,

2) to officially record the grade, and

3) to inform the student,

no penalty be imposed on the student for these grades.

The Committee, therefore, recommends that Miss Wasmuth's grade in BH 122 be based on the two accepted exams of C+ and B." (Defendants' Exhibit SS).

Notwithstanding the determination of the College Review Committee, the plaintiff refused to change Ms. Wasmuth's grade from an "I" to a C+ or B. The student was advised to pay a fee of $30 to take another makeup exam. Finally in December 1981, the second makeup exam was completed and the student received her grade, some eighteen months after the initial makeup exam.

Due to the refusal of the plaintiff to comply with the determination of the Grievance Review Committee, President Cipriani was required to advise the Registrar of the finally determined grade. He did so in a memorandum dated December 23, 1981, which read as follows:

"Ms. Barbara Wasmuth filed an academic grievance over her grade in BH 122, Sociology. The grievance, which was filed in accordance with the campus academic grievance policy as adopted by the faculty, was heard by the campus review committee. After reviewing all the pertinent documents as well as hearing testimony from both the instructor and the student, *the review committee unanimously determined that Ms. Was-muth had not been granted the full opportunity to complete the work as assigned by the Instructor.* Upon my review of the case, I concurred with the findings of the review committee.

Subsequent to this finding, Ms. Barbara Wasmuth's work was evaluated through the college's official credit-by-evaluation procedure. A grade of 'B' was determined and is reflected on the transcript as a pass under the present pass/fail grading system that is used in the credit-by-evaluation procedure." (Defendants' Exhibit TT [emphasis supplied]).

## 2. *The Late Grades in 1981*

In 1980, the plaintiff made a trip to India and returned late, on January 29, 1981. The plaintiff's students were to receive their grades prior to Christmas Day, 1980. As a result of this trip, the plaintiff's students did not receive their grades until February 12, 1981 and were each given a mark of "I" for incomplete, which mark, if not changed, would have been converted into an "F".

During the period of the plaintiff's absence, his classes were covered by five or six different professors or adjuncts. In the "News & Notes" of the Soc–Anthro Dept dated January 21, 1981, the following appeared:

"From Jan. 26—Jan. 28, 1981, Dr. Sinha's classes were covered by Paul Lovizio, Chris Lovizio, Abdul Naseem, Dorothy Kelly, Mary Diaz, R. Dunstan, Anna Senyk. Many thanks." (Defendants' Exhibit XXX).

Professor Zulli testified that this "late grades" situation was a very serious offense and was rarely done by a faculty member. According to the then Vice President of Academic Affairs, this offense alone would be sufficient to justify denial of promotion.

As set forth in a memorandum from Chair Senyk to Dean Gerard dated 1/27/81, regarding plaintiff's then absence, contradictory information was furnished to the school as to the plaintiff's whereabouts, as follows:

"Subject: Absence of Dr. A. Sinha

This note is to inform you that Dr. A. Sinha will be absent from his evening classes from January 26, 1981 through January 28, 1981. He is expected to resume his teaching on Thursday, January 29, 1981.

\* \* \* \* \* \*

Notification of Dr. Sinha's absence came from two sources.

1. On Monday morning Mrs. Hartmann received a call from a Mrs. Cox who indicated that she was calling for Dr. Sinha who informed her that he was in Germany with dysentery and could not leave. She said he was expected to be in classes on Thursday, January 29, 1981.

2. On Monday afternoon I received a cablegram (telephone) indicating that Dr. Sinha was stranded in New Delhi and that he was arriving on January 28, 1981." (Defendants' Exhibit UU).

According to Dr. Vinciguerra there were additional late submissions of grades as recently as two or three semesters ago. In addition, on frequent occasions whole classes complained about the plaintiff's absences and lateness.

3. *Plaintiff's Trip to India With Regard to His Mother's Death in 1983*

Although the plaintiff left the college to go to India in 1983 and remained away for an extended period of time, he did not fill out the required forms which would provide coverage for his classes in his absence; he did not provide for coverage for his classes; and he did not obtain permission to go. The Court notes that the plaintiff was notified of his mother's death on or about November 1, 1983 and did not leave for India until November 30, 1983, affording him sufficient time to arrange coverage for his classes. Yet, he failed to do so. The Court fully appreciates the necessity for the plaintiff to leave the college at that time, but also takes cognizance of the continuing responsibility of a professor to his students to maintain class continuity.

4. *The Complaints by Students Leitch and Bonserio*

On January 25, 1983, Chair Senyk received a written complaint, in the form of a two-page letter, from students Mary Anne Leitch and Diane Bonserio. The husband of Ms. Bonserio had been murdered and she could not take the regular exam. She requested a makeup exam. Again, there was a problem with the scheduling of a makeup exam and the two students filed a grievance. It seems that prior to scheduling a makeup exam, the plaintiff required the students to do additional work.

The Grievance Committee conducted a full hearing and, among other things, recommended that the plaintiff change Ms. Leitch's grade of "F" to "W". (Defendants' Exhibit XX, p. 4). The plaintiff refused. In two memoranda, both dated January 27, 1984, Dr. Vinciguerra wrote to President Cipriani, explaining the situation. (Defendants' Exhibits YY and ZZ). In one of them, Dr. Vinciguerra summarized the Leitch and Bonserio situation as follows:

"SUBJECT: Academic Grievance— Leitch and Bonserio versus Sinha.

I have reviewed the recommendations of the Academic Grievance Committee regarding the Leitch and Bonserio versus Sinha grievance. The only obstacle remaining to the resolution of this problem is Dr. Sinha's unwillingness to abide by the first recommendation of the Committee, namely to change Mrs. Leitch's grade from an 'F' to a 'W'.

While I know we both share a deep respect for an instructor's right and responsibility to evaluate student performance and reflect this evaluation in the form of a grade, I must, albeit with great reluctance, recommend that you, as chief administrative officer, change Mrs. Leitch's grade from an 'F' to a 'W' in accordance with the recommendation of the Academic Grievance Committee. I ask that you seriously consider doing this since in my opinion Mrs. Leitch is being denied the same opportunity that Dr. Sinha afforded Mrs. Bonserio. *The denial appears to be based solely upon a non-academic reason, that is his require-*

*ment that she apologize for a statement regarding the importance of sociology as it relates to nursing.* I do not believe that such an apology constitutes a criterion upon which a grade should be given.

If you agree with my recommendation, I will have the correspondence prepared for your signature informing the Registrar's Office of your decision and requesting that they make the necessary change on Mrs. Leitch's transcript. Thank you for your consideration." (Defendants' Exhibit YY [emphasis supplied]).

## 5. *Plaintiff's Coverage of His Classes in the Fall of 1983*

Again, there was an apparent repetition of the plaintiff leaving for India without providing coverage for his classes. The Court notes that this trip to India was not during the summer recess period, but was during the regular school session, a most unusual time for a vacation. A memorandum from Chair Senyk to Vice President Vinciguerra dated November 30, 1983, illustrates the problem:

"SUBJECT: Dr. A. Sinha's coverage of classes.

This memo is sent in response to your verbal directive that I send you a statement as to whether Dr. Sinha completed his professional obligations in terms of covering the course content in each of his classes and whether he satisfied the credit-hour requirements.

At this time, I cannot give you a positive or negative answer. All I have in my possession is a hand-written, undated memo, from Dr. Sinha, which came to my office via Dr. R. Mark. I need more definitive material in order to make an evaluation.

For the record, I did not give Dr. Sinha permission to leave for India before the end of the academic semester, Fall, 1983." (Defendants' Exhibit I).

In addition, there were problems with the course outlines the plaintiff had to prepare so that his class would have some continuity during his absence. In a memorandum dated January 23, 1984, Chair Senyk commented on two of these outlines, as follows:

"SUBJECT: Evaluation of Dr. Sinha's Outlines.

On Friday, January 21, 1984, I was instructed by Dr. Mark to review two course outlines—BH122, Sociology and BH224, Urban Sociology—which Dr. A. Sinha submitted to Vice President Vinciguerra before Dr. Sinha left for India. These outlines, according to Dr. Sinha, were to have explanatory remarks.

This morning, January 23, 1984, I reviewed these outlines. The remarks in the margins of each outline indicated the dates of coverage of designated units. There is insufficient evidence to give you an answer as to depth and breadth of instruction that occurred." (Defendants' Exhibit K).

On January 5, 1984, the then Vice President for Academic Affairs, Michael J. Vinciguerra, wrote the plaintiff advising him of the seriousness of his absence without approval, as follows:

"Dear Dr. Sinha:

I wish to inform you that your termination of classes before the official end of the Fall '83 semester was done without official approval. . . . you were directed to address the two major issues of covering the course content and delivering the appropriate instructional hours. . . .

Unfortunately, from November 3 on you did not follow these directions. . . . Only the President may grant such approval for a leave of absence and you did not even allow time for a recommendation to be made to him.

In an effort to be understanding during this emotionally difficult period for you, I requested Professor Senyk, to review the explanatory materials you left with Dean Mark. In a memorandum to me dated November 30, 1983, Professor Senyk has informed me that she would need more definitive material to make an evaluation as to whether your professional obligations in covering the course content and the credit hour requirement were

actually met. Therefore, at this moment, the Chairperson of your own department is still unable to ascertain whether the students in your classes, both day and evening, have actually received the instruction to which they were entitled or need to pursue further studies in Sociology and allied disciplines.

... Apparently some students believe that they have been shortchanged and are not prepared to enter any advanced classes in Sociology. The institution is now in the uncomfortable position of having to address this issue, but, as I previously stated, is really unable to do this fully since we still cannot ascertain what you actually covered in the course.

 \*   \*   \*   \*   \*   \*

I believe the College has made every effort to assist you and was ready to employ adjuncts for the remainder of the semester if that was required. *Your inability to follow directions that would have enabled us to approve or disapprove your verbal request has created an extremely serious situation which must be properly addressed.*" (Defendants' Exhibit J [emphasis supplied]).

A more explanatory memorandum from Chair Senyk to Dean Mark, dated February 24, 1984, is illuminating, and constitutes evidence of the plaintiff's pattern of behavior; namely, lack of responsibility in leaving his classes without sufficient materials to be used by his substitutes. The memorandum read as follows:

"SUBJECT: Evaluation of Dr. Sinha's material.

This memorandum is in response to your request to evaluate materials submitted by Dr. A. Sinha, for the purpose of determining whether the course content in each course he taught during the Fall, 1983 semester was covered prior to his terminating his classes on November 28, 1983.

1. Dr. A. Sinha was assigned to teach BH 224, Urban Sociology and BH 122, Introduction to Sociology, for the Fall, 1983 semester. Since Dr. Sinha failed to submit materials pertaining to BH 224,

Urban Sociology, I cannot state that the students covered the outline given them at the beginning of the semester.

2. The outline submitted entitled, 'Course Content—Part I, II, III, IV,' I assume refers to the BH 122 outline. The areas stipulated on this outline coincide with the areas designated on the BH 122 outline given the students at the beginning of the Fall semester.

3. In the BH 122 outline distributed in September, 1983, to his students, Dr. Sinha's requirements included three exams, one class report, class participation and attendance. In the second outline part of this requirement is missing. Mention is made of three exams and one optional exam. Was the optional exam substituted for the class report?

4. In his memorandum of November 16, 1983, Dr. Sinha indicated that by November 28, 1983, the students would have four to five grades. How many grades did each student have at the end of the semester?

5. The materials submitted by Dr. Sinha do not sufficiently demonstrate that the course material in BH 122 was covered in breadth and depth. Copies of take-home exams, class exams, reports would be helpful in reaching a decision." (Defendants' Exhibit N).

Professor Senyk testified, without contradiction, that every other professor left sufficient material and outlines when they knew they would be absent from classes.

This situation was serious enough for the President to become involved. On February 28, 1984, Dr. Cipriani wrote to the plaintiff, as follows:

"Dear Dr. Sinha:

It has been brought to my attention that you recently sustained an injury which has interfered with your ability to meet your professional obligations during this semester.

In accordance with Article 13, Title C, section 4(c) of the *Policies of the Board of Trustees*, you are hereby required to

furnish suitable medical evidence for absences which occurred on:

January 24, 1984
February 1, 1984
2, 1984
6, 1984
7, 1984
9, 1984
13, 1984
14, 1984
15, 1984
27, 1984
28, 1984

Furthermore, you will be required to provide suitable medical evidence of temporary disability for any future absence during this semester....

The above required documentation for the absences cited above must be received by my office no later than the close of the business day on March 9, 1984." (Defendants' Exhibit BBB).

It was finally determined that, as a result of the plaintiff's absence, one class "missed a total of 375 minutes of instruction" and another class lost "450 minutes of instruction time." (Defendants' Exhibit M [referring to courses BH 122 and BH 224]).

### 6. Students Lund and Miller

Professor Senyk testified regarding a complaint from student Lund, who came in to meet with the plaintiff from Connecticut in a rainstorm. Instead of the plaintiff, he found a secretary waiting for him. Student Miller had a similar experience.

\*     \*     \*     \*     \*     \*

The remaining reasons outlined by the Court occurred after the Complaint was filed on August 29, 1985. The Court notes that evidence after August 29, 1985—of non-discriminatory reasons why the defendants did not promote the plaintiff as well as evidence rebutting any proof offered by the plaintiff to prove pretext—were admitted at trial without objection. (See Krieger v. Gold Bond Bldg. Products, 863 F.2d 1091, 1096 [2d Cir.1988] [failure to object at trial waives challenge to admissibility]).

The Court further notes that such evidence is relevant to the Court's conclusions of law, in that it is (1) circumstantial evidence of the defendants' intent or motive in not promoting the plaintiff (see Fed.R.Evid. 404[b]; Ismail v. Cohen, 899 F.2d 183, 188 [2d Cir.1990] [subsequent act evidence admissible to prove defendant's intent or motive, in civil rights case]; United States v. Ramirez, 894 F.2d 565, 569 [2d Cir.1990] [same, in criminal case]; Krieger v. Gold Bond Bldg. Products, supra, 863 F.2d at pp. 1096–97 [subsequent act evidence admissible against to prove defendant's intent or motive, namely pretext, in Title VII case] ); and (2) opinion evidence attacking the credibility of the plaintiff (see Fed.R. Evid. 608[a] ).

While relevant, this evidence is by no means the sole basis for the Court's legal findings; to the contrary, the Court finds that it would reach the same conclusions of law, see infra, even were it not to consider any evidence concerning events which took place after August 29, 1985.

### 7. Additional Diverse and Continuing Complaints

In addition to the situations already reviewed, the evidence revealed additional diverse and continuing complaints against the plaintiff by his students involving lateness; failure to timely mark test papers; not knowing when an exam will be given; exams proctored by a secretary without the presence of the plaintiff in the classroom; students in turmoil because of unannounced exams; and failure to be in his office and available to students during regularly scheduled office hours. As a result of this irresponsible behavior towards the students, unnecessary problems were created. Students became angry because of his absences and lateness, and word "got around" that if you had Professor Sinha, your class may start late, be dismissed early or be cancelled.

In this regard the Court notes the testimony of Professor Raymond D. Dunstan, a male member of the Soc–Anthro Dept who stated that the plaintiff frequently failed to teach his regularly scheduled classes. On some of these occasions Professor Dunstan covered for him. After a while it became so burdensome that other arrangements had to be made, and the Dean decided that

other persons had to be employed to cover the plaintiff's classes.

Present Chair Christine Lovizio testified that the plaintiff lost his evening teaching assignment because of the repeated complaints from students concerning his excessive absences and latenesses. She personally received complaints from day and evening class students and she testified that she is still receiving these kinds of complaints.

One of these letters of complaint dated November 18, 1987, signed by twenty students, noted that "six out of the seven absences were on Mondays" and furnished details of the matters complained of, as follows:

"November 18, 1987

To: Prof. Lovizio
    Dr. Mark

The following students of Dr. A. Sinha's class; SOC122–Introduction to Sociology, which meet on M/W at 9:35 to 10:50, wish to file the following complaints:

1. Consecutive lateness and absences. The following are the dates which he has been absent:

Wednesday, September 9
*Monday, September 14
*Monday, September 21
*Monday, October 26
*Monday, November 2
*Monday, November 9
*Monday, November 16

2. Lectures are unclear in legibility and understanding.

3. Defensive when asked questions.

4. Notes never correlate with textbook. The textbook was never referred to nor used during class.

5. Some material on test was not covered in class.

6. We would like to request a substitute teacher on the next date he is absent.

7. In result of Dr. Sinhas excessive absences we the students do not feel that we should be penalized for his absences.

**8. The course requirements for SOC122 are 3 exams and 1 class report. We have had one test so far and we feel that there is not enough time nor notes to have 2 more exams since we have only 7 more class meetings, if there is no more absences by Dr. Sinha.

*NOTE: Six out of the seven absences were on Mondays. **also see attached list of guidelines.

Respectfully,"

[Twenty handwritten signatures].

(Defendants' Exhibit CCC).

Professor Lovizio received a "volume" of written complaints from students similarly complaining of the plaintiff's absences and latenesses and about his being verbally abusive. Since 1985, when she assumed the chairmanship, seventy-seven students sent in written complaints concerning the plaintiff in a period of five and one-half years. During that time there were also received four letters complimenting the plaintiff.

In a summary of the plaintiff's attendance record since she became Chair of the Department, Professor Lovizio testified that the plaintiff was absent more frequently than any other member of the department. For example, he had more than nine absences in the 1987 evening classes. Although she admitted that sometimes the plaintiff was unable to reach her, she often would get a call from him one hour before the class, which made it impossible to obtain a substitute teacher.

At various times Professor Lovizio was not able to reach the plaintiff at the telephone number provided. On other occasions she called the number the plaintiff left for her and was told that the plaintiff was "working" or that he was at a closing. She stated that no one on the faculty is absent from class as much as the plaintiff and no one on the faculty receives such a volume of student complaints.

8. *Observation of Plaintiff's Teaching*

Professor Lovizio testified that she "observed" the plaintiff by sitting in on one of his classes in 1987 after notice to the plaintiff and with his consent. The reason for the "observation" was that the plaintiff advised Professor Lovizio that the students were disruptive and rude and he no longer

wanted to teach that class. She observed that the attendance was poor—only twenty-two out of forty-two students were present—there was noise and cross-discussions by the students. In the midst of the lecture, three or four students got up and walked out of the room.

Professor Lovizio was of the opinion that in this particular class there was no rapport between the teacher and the students. No questions were asked by the students. Many students were rude and the plaintiff apparently could not control the class.

9. *Plaintiff's Recent and Continuing Problems*

It is apparent to the Court that the troubling absence from class by the plaintiff is continuing. As recently as November 21, 1990, Dean Mark wrote a memorandum to him on this subject, as follows:

"November 21, 1990
TO: Dr. Anand Sinha
Department of Sociology and Anthropology
FROM: Dr. Robert V. Mark, Dean
School of Arts and Sciences
SUBJECT: ABSENCE

Yesterday my office was notified by Professor Lovizio that you were absent from your two scheduled classes and scheduled office hours. Contrary to Professor Lovizio's memo of November 7 (attached), you did not notify my office of your intent to be absent.

According to Professor Lovizio, Dr. Monte Rivera informed her of your absence at 1:55 p.m., long after the first of your scheduled classes (12:35 p.m.) had begun and only shortly before the second class (2 p.m.) was to begin. Professor Lovizio went on to report that Dr. Rivera had informed her that he had received a call from you at 10 a.m. informing him of your expectation to be absent and to cancel your classes. *Reportedly, Dr. Rivera announced to the 12:35 p.m. class that you would not be present that day.* Professor Lovizio also reported that '... many students were upset because of a scheduled exam'.

Your action directly violates the policy established by your chairperson and has led to unwarranted disruption of your students' instruction. Past correspondence reminded you that early warning of your impending absence will allow us to try to make arrangements to hire a replacement instructor.

[signed] *Robert V. Mark*" (Defendants' Exhibit DDDD [emphasis supplied]).

Plaintiff's problem as to office hours is apparently also persisting. In a memorandum from Dean Mark to the plaintiff dated October 11, 1990, it was stated:

"SUBJECT: OFFICE HOURS

My memo to you of September 14 described my belief that the office hours which you had established would allow you insufficient time to meet both your office hour obligation and your obligation to arrive punctually for class. Such a conflict has arisen. Although your office hour on Wednesday is scheduled to end at 12:32 p.m., yesterday you were observed entering Gleeson Hall at approximately 12:25 p.m.

You are directed to immediately resolve the conflict which your choice of office hours has created. If it is your decision to change your office hours you are to do so through your department chairperson." (Defendants' Exhibit IIII).

As a result of these continuing problems, the plaintiff was directed to report to the Dean's office at the beginning and end of each day, among other restrictions. (See Plaintiff's Exhibit 18).

A "summary of the details of the incidents involving Dr. Sinha" was the subject of a memorandum dated September 21, 1990, and is replete with absences and lateness: Fall 1988—absent four days, late six days and left early once (one student made written complaint); Spring 1989—absent five days and late three days; Fall 1989—absent three days and late three days (three students made written complaints); Spring 1990—absent 8.5 days during the semester (23 of his students petitioned for assistance because of what they perceived to be his "inability ... to properly teach

their class"); plaintiff regularly arrived late and left early for his office hours during April–May, submitted grades after the deadline; Fall 1990—absent on three occasions in the first four weeks. (Defendants' Exhibit JJJ).

Remarkably, the plaintiff did not deny or contest the evidence of these absences and latenesses.

### 10. *Additional Non–Discriminatory Reasons*

(i) Professor Senyk, the plaintiff's direct supervisor, testified at length about his habits of arriving late for some classes, leaving early in other classes and not appearing at all for some evening classes. Sometimes the plaintiff called to cancel a class and on other occasions she discovered his absence when she walked through the building and found an empty classroom.

(ii) Professor Senyk further testified that, as to departmental committee meetings, sometimes the plaintiff arrived late, left early or did not appear at all.

(iii) On at least two occasions, plaintiff's requests to attend conferences out of state were denied because he failed to provide coverage for his classes and failed to complete the required form for such absences.

For example, on February 23, 1978, Professor Senyk denied the plaintiff's request for a state car and for leave to go to Washington, D.C., as follows:

"I am denying your request for a state car and a leave to go to Washington, D.C. for the following reasons:

1. Your form is incomplete. The section on *Absence from Campus* needs to be filled in. Also documentation is lacking. See note at bottom of the form." (Defendants' Exhibit UUU [emphasis in original]).

In a March 14, 1980 memorandum, it was again stated that the plaintiff wanted to leave his classes to go to a conference in California without the proper coverage, presenting a problem for the students, as follows:

"It is my understanding that Vice President Zulli may approve your leave for the International Studies meeting. There is, however, a problem of class coverage. Up to this date I have nothing in writing that indicates how your classes will be covered. Will you please put in writing how you specifically will have your classes covered during your absence." (Defendants' Exhibit TTT).

(iv) As a result of a conference of the New York State Sociological Association, a bill for food service of $900 owed to a caterer was incurred. In a memorandum dated May 25, 1979, President Cipriani offered the plaintiff an option to resolve the payment of the bill. (*See* Defendants' Exhibit PP) However, the plaintiff did not arrange to pay the bill, and it had to be written off.

The Court credits the testimony of Dr. Frank A. Cipriani, President of Farmingdale, who reviewed in detail the promotion procedures. President Cipriani is responsible for making all promotions. In this regard, he applies state-wide policies, in that he promotes the "best qualified" person after consultation with the college-wide committee lists and with the Academic Vice President.

In section 4.3.4 of the Farmingdale handbook, the responsibilities of a faculty member are set forth and include the following:

"a. Maintain professionalism in the conduct of classes. To accomplish this, faculty should:

Be conscientious and punctual in meeting assigned classes.

Inform the department chairperson or designee if absence from class is anticipated.

\*      \*      \*      \*      \*      \*

b. Maintain student records to include attendance records, grades and such other records as required by the Department and/or the College.

c. Furnish students with the following information at the beginning of each semester:

Office hours, office location, and telephone extension number.

Course requirements, general course objectives, topic outline, text and references.

\*    \*    \*    \*    \*    \*

*Attendance Policy:* Faculty members are required to meet all scheduled classes. Beyond scheduled class time, they must meet all professional obligations related to the college, the school and the department.

If illness prevents a faculty member from meeting a class or other professional obligation, the faculty member must inform the department chairperson at the earliest opportunity." (Defendants' Exhibit B).

Dr. Cipriani testified that the reason he did not promote the plaintiff is that he began to get reports of problems involving the students, including the Barbara Wasmuth grievance. He explained that it was very important for a professor to deliver the students' grades to the Register within forty-eight hours after the end of the semester. In the Wasmuth occurrence, a whole semester elapsed before the student finally received her grade. It was the first time anything like this occurred at the school. Dr. Cipriani explained the consequences of a professor's absence from class without supplying the proper outline and materials to the substitute teacher. The resulting confusion and anger by the students not only inures to their personal detriment as a college student but also causes damage to the college itself, in that it impairs the integrity of the faculty in chief and may even affect the school's accreditation.

The same problem involving the plaintiff's absences and lateness to classes and office hours is continuing, according to President Cipriani. He recently authorized another Notice of Discipline against the plaintiff.

Significantly, with regard to the plaintiff's contention that he is being discriminated against as a Professor of Indian descent, President Cipriani testified that of the seven members of the faculty of Indian descent, all of them have been promoted except the plaintiff. A list of the salaries of the Indian–Asian faculty was introduced (Defendants' Exhibit MMM). It revealed that Professor Purandare, a full Professor and Department Chair, earns one of the highest faculty salaries, that Professor A. Naseem, a male Indian, was promoted to full Professor in 1981, and that Professor O. Malhotra, a male Indian, was promoted to full Professor in 1986.

As to the awards of discretionary monies, President Cipriani testified that "in all cases performance is the major element". The Court so finds.

President Cipriani testified that the abolition of the "carryover" system in 1983 was done to initiate a more merit-application system and was not done to discriminate against the plaintiff. The Court agrees. The carryover system unfairly blocked stronger candidates and was properly revised.

(v) In the opinion of Dr. Michael J. Vinciguerra, formerly Vice President for Academic Affairs and presently Provost of Farmingdale, the plaintiff lacks the basic teaching responsibilities because the needs of his students were not addressed and by reason of his excessive lateness, absences, untimely grade submissions and the existence of three academic grievances against him. According to Dr. Vinciguerra, this opinion is not affected by race, national origin or sex.

ADDITIONAL FINDINGS OF FACT

1. The record does not support the plaintiff's contention that there was discrimination against him in the Soc–Anthro Dept because he is a male. For example, in the October 29, 1982 Department promotion list, Professor Christine Lovizio was ranked ahead of Professor Monte Rivera (*see* Defendants' Exhibit X), yet only Dr. Rivera was promoted that year.

2. The Court finds that Chair Ann Senyk did not in any way discriminate against the plaintiff as a male or by reason of Indian descent. On the contrary, the Court finds that the plaintiff's problem vis-a-vis promotion, discretionary monies, evening school and summer school were due to his

own inability to follow the rules; his failure to appear at class; his failure to timely file his grades; and the other non-discriminatory reasons set forth above.

3. The Court finds that the plaintiff's derelictions in his duties as an assistant professor preceded the filing of his EEOC complaint, and, thus, could not be retaliatory measures.

4. The Court finds that in 1983 President Cipriani properly abolished the "carry-over" system and relied on a "merit selection" system; and not because of an attempt to discriminate against the plaintiff.

5. The Court finds that the plaintiff intermittently failed to properly discharge his duties as an assistant professor by engaging in uncovered absence and lateness in class and office hours.

6. While the Court finds that there was some hostility between some males and some females in the culturally diverse Soc–Anthro Department, such feelings did not result in any discrimination against the plaintiff with regard to promotion or any other matter.

7. In sum, the Court finds that both the direct and circumstantial evidence fails to establish a discriminatory motive or intent on the part of the defendants. (*See Woodbury v. New York City Transit Authority*, 832 F.2d 764, 768 [2d Cir.1987] ["A finding of discriminatory intent is a factual determination"] ).

## CONCLUSIONS OF LAW

■ 1. The Court finds that the plaintiff has established a *prima facie* case of sex, national origin and racial discrimination. (*See Montana v. First Federal Savings & Loan Ass'n of Rochester*, 869 F.2d 100, 106 [2d Cir.1989] [emphasis supplied] ["To establish a prima facie case of sex discrimination under Title VII, plaintiff was required to show that she was treated less favorably than comparable male employees in circumstances from which a gender-based motive *could* be inferred"]; *Sweeney v. Research Foundation of the State University of New York, supra*, 711 F.2d at p. 1184 ["the complainant's initial burden of establishing

a prima facie case is not onerous, and reviewing courts should not be preoccupied with whether a prima facie case has been established"] ).

■ 2. The Court finds that the defendants articulated clear and convincing evidence of many valid, legitimate, non-discriminatory reasons for failing to promote the plaintiff to the position of Associate Professor; for failing to award the plaintiff additional discretionary monies; and for refusing to allow the plaintiff to teach at evening school or summer school at Farmingdale. Accordingly, the Court finds that the defendants have satisfied their burden of producing specific, objective, competent evidence (*see Sweeney v. Research Foundation of the State University of New York, supra*, 711 F.2d at p. 1185) that their failure to promote the plaintiff was not based on sex, national origin or race, but was based on the plaintiff's poor performance as a professor, as outlined *supra*, and that the plaintiff's poor performance was a legitimate and non-discriminatory basis for the defendants' failure to promote the plaintiff.

■ 3. The Court finds that the plaintiff failed to establish that the defendants' stated reasons for failing to promote him, failing to award him discretionary monies, or failing to allow him to teach at evening school and summer school, were pretextual. (*Cf. Zahorik v. Cornell University, supra*, 729 F.2d at pp. 94–95 [Court affirmed defendant's motion for summary judgment dismissing four female professors' Title VII claims alleging failure to award tenure, and held that there was no evidence that the decisions were based on gender]; *Louis v. Board of Education of the City of New York*, 705 F.Supp. 751, 759–60 [E.D.N.Y. 1989] [in Title VII action brought by black male school principal who alleged that he was denied tenure because of his race, court found that there was no evidence that parents' and teachers' complaints about the plaintiff were not genuine or were baseless]; *see also Chang v. University of Rhode Island*, 606 F.Supp 1161, 1253 [D.R.I.1985] [applying *Zahorik* to failure to promote claim] ).

4. The Court finds that the plaintiff failed to establish that he was denied promotion, that he was denied the award of discretionary monies, or that he was denied the right to teach in the evening school or in the summer school as a result of discrimination against him by reason of the fact that he is a male minority of Indian–Asian descent.

## CONCLUSION

Accordingly, for the reasons stated, the Court directs the entry of a judgment in favor of all of the defendants dismissing the complaint.

SO ORDERED.