**Edward Ramos SOUSA, Plaintiff,**

v.

**Jerry HUNTER, General Counsel, National Labor Relations Board, Defendant.**

No. 85 CV 3703.

United States District Court,
E.D. New York.

June 5, 1990.

Edward Ramos Sousa, pro se.

Pamela R. Perron, Asst. U.S. Atty., Andrew J. Maloney, U.S. Atty., E.D.N.Y., for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Plaintiff, a former employee of defendant National Labor Relations Board ("NLRB"), brings this discrimination action under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* Plaintiff, a Hispanic male, alleges that his discharge was based, at least in part, upon his race and color.[1] Specifically, he alleges that he was harassed, intimidated and terminated because of his national origin. He further alleges that Region 29 discriminated against all racial minorities. For himself, plaintiff seeks reinstatement, promotion and back pay. The case was tried before me without a jury. The following constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

## FINDINGS OF FACT

Plaintiff graduated from law school in 1981. He was hired by the NLRB as a "law clerk trainee" with the rank of GS 9 in Region 29, Brooklyn, New York on November 6, 1983. In this capacity he was expected to investigate charges of unfair union representation and unfair employer labor practices, interview witnesses, research various statutes, draft pleadings, and to write final investigative reports and legal memoranda. His initial appointment was probationary for a period of twelve months, during which time his performance would be evaluated.

Plaintiff's immediate supervisor was Anthony Ambrosio. On April 6, 1984, six months after plaintiff was hired, Mr. Ambrosio chided the plaintiff about various deficiencies and omissions in his investigations and his final investigative reports. Mr. Ambrosio urged plaintiff to seek his supervisor's advice, counselling and direction; and he offered to help plaintiff improve in any way he could. Despite this offer, plaintiff did not seek guidance from his supervisor, and his work did not improve.

Mr. Ambrosio spoke to the Regional Director, Samuel Kaynard, about plaintiff's poor performance. He further memorialized his criticisms in a memorandum dated July 3, 1984. For example, in cases involving the union's duty of fair representation,

---

1. Plaintiff also claims that he qualifies as a black man, although this came as a revelation to the NLRB after plaintiff had been terminated. Nowhere in his pre-termination personnel files is there any indication that he is black. There is no evidence that anyone at the NLRB ever knew plaintiff was black, and, therefore, the fact that he is black—if indeed he is—did not enter into the decision to terminate him. In any event, plaintiff's evidence on this point was totally unpersuasive.

plaintiff erroneously focused upon the employer's conduct rather than the union's representation. In taking witnesses' affidavits, plaintiff often omitted necessary information. Most significantly, plaintiff's writing suffered from incomplete sentences, inclusion of irrelevant repetitive material, and overall disorganization and incoherence. Mr. Ambrosio's memorandum concluded that if plaintiff's work did not improve, he would not be retained. Plaintiff received a copy of this memorandum.

Under the Collective Bargaining Agreement between the NLRB, as employer, and the Union representing plaintiff, he could not be fired until he had first been given a Performance Improvement Plan ("PIP") noting his deficiencies and affording him a reasonable period to correct them.

Mr. Ambrosio wrote such a PIP on August 3, 1984 and gave plaintiff a copy. The PIP again recited plaintiff's problems, as perceived by Ambrosio, but this time in great detail. It specifically suggested several ways to improve, including instructions how to better organize reports chronologically and a reading list of important legal resources. The PIP noted that plaintiff appeared reluctant to speak with his supervisor concerning case-handling problems and stressed the importance of supervisory assistance. Plaintiff was allowed six weeks to implement the improvement plan, otherwise he was advised that he would be terminated.

At the end of six weeks, plaintiff was evaluated by three supervisors. Unfortunately, their collective judgment was that he had not improved and that his oral and written communication skills were "unsatisfactory." The quality and timeliness of his work remained only "marginally satisfactory," while his relationships with other people were "satisfactory."

The rest of the chronology is uncontested: on October 2, 1984, the NLRB notified plaintiff that he would be discharged. Plaintiff then submitted a request for reconsideration which was denied. His appeal to the General Counsel was similarly denied. The NLRB then terminated his employment on November 2, 1984.

Paralleling this tale is another sub-text: plaintiff's difficulties passing a bar examination. Apart from the twelve-month probationary period during which a law clerk trainee's performance is appraised, there is another condition of employment: the trainee must pass a state bar examination and be admitted to practice within fourteen months of hiring. This is an absolute limitation upon the right to be retained; and the former Regional Director testified categorically that there was no discretion to waive this requirement.

Although the NLRB granted plaintiff leave to study for the New York bar exam in February and July 1984, he did not pass any bar exam while he was employed with the NLRB. In fact, plaintiff was not admitted anywhere until three years after he left the NLRB—despite eleven bar examinations in Florida, New York and New Jersey—when he passed the New Jersey Bar. Thus, even if Mr. Sousa had satisfactorily performed his work, he could not have remained as a law clerk trainee beyond January 6, 1985. In short, even if plaintiff could prove discrimination, his damages would perforce be limited to the two months between November 2, 1984, when he was terminated and January 6, 1985 when the NLRB would have been bound to discharge him.

Plaintiff lodges three specific complaints against the NLRB, in general, and Mr. Ambrosio, in particular. He alleges that Ambrosio harassed, yelled at, and intimidated him because the plaintiff is Hispanic. The evidence, however, is that Mr. Ambrosio is a "yeller" and he rakes all subordinates with fine impartiality. Thus, Joel Friedman, a white male attorney who worked under Mr. Ambrosio, testified that Mr. Ambrosio had also berated him. And Lillian Perez, a Hispanic woman who has worked at Region 29 for more than fifteen years, testified that Mr. Ambrosio yells at everyone. It may be noted that the physical plant at Region 29 is cramped and the workload heavy.

Plaintiff also taxes the NLRB for its failure to provide him with proper legal training. The evidence, however, is overwhelmingly to the contrary. The NLRB provided weekly lectures, which the plaintiff generally attended, and a training seminar in Washington, D.C., which he also attended. In addition, he was urged to confer frequently with his supervisor, or if Mr. Ambrosio was unavailable, with other supervisors or the Regional Director himself. He was, of course, also free to ask questions of his peers.

Plaintiff is also distressed that he was, on occasion, called upon to translate and interpret Spanish, French and Portuguese, a task that falls outside the responsibilities of a law clerk trainee. Perhaps, as a matter of labor law, the plaintiff is correct, but in this Title VII suit plaintiff must demonstrate that these extraneous tasks were foisted upon him out of racial animus. Again, the proof is not there. The evidence is that many attorneys worked outside their job description—typing, xeroxing or doing other necessary tasks, as one white male attorney testified.

## CONCLUSIONS OF LAW

It is an unfair labor practice, under Title VII of the Civil Rights Act of 1964, for an employer to discriminate against anyone in hiring, discharge or the terms and conditions of employment because of the individual's race, color, religion, sex, or national origin. Similarly, it is illegal to limit, segregate or classify employees in ways that adversely affect the employee's status because of his race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1) and (2).

■ Two distinct theories of liability have evolved under Title VII, the first commonly known as "disparate treatment," the second as "disparate impact." Under the first theory, "proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *see Watson v. Fort Worth Bank*

*and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2779–80, 101 L.Ed.2d 827 (1988); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1989); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 806, 93 S.Ct. 1817, 1826, 36 L.Ed.2d 668 (1973). Under the second theory, plaintiff may prove his case by establishing that his employer maintained a policy or practice that, although fair in form, resulted in a disparate impact upon a specific minority. *Wards Cove Packing Co. v. Atonio*, —— U.S. ——, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989). In this case, it is grossly obscure whether plaintiff meant to prove disparate treatment or disparate impact.

■ *Disparate Treatment.* Although the seminal cases on disparate treatment involved invidious hiring practices (*see, e.g., Burdine*, 450 U.S. 248, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817), the theory has been extended to failure to promote cases and termination cases, as well. *See, e.g., Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777 (failure to promote); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989). To make out a prima facie case, plaintiff must initially establish (1) that he belongs to a protected class; (2) that he was qualified for the job; and (3) that he was discharged under circumstances "giving rise to an inference of racial discrimination." *Ramseur*, 865 F.2d at 464; *see McDonnell Douglas*, 411 U.S. at 803, 93 S.Ct. at 1824. If plaintiff makes out a prima facie case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection. Plaintiff then may prove that the employer's reason was pretextual. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093.

■ Plaintiff has failed to prove any discriminatory intent on the part of Messrs. Ambrosio, Kaynard, Friedman or any other NLRB supervisors. Moreover, he has

failed to establish a prima facie case that he was qualified to be retained or promoted at the NLRB. Based upon plaintiff's inadequate writing abilities, his inability to investigate and research a case thoroughly and his failure to improve, the NLRB proved a legitimate non-discriminatory reason for terminating plaintiff—namely lack of merit. Plaintiff has failed to explain his poor performance. He has been unable to show that his supervisors' appraisals were pretextual. Therefore, I reject plaintiff's suggestion that he has demonstrated "by a preponderance on [sic] the evidence that the legitimate reasons offered by the employer was [sic] a pretext for discrimination." (Proposed Plaintiff's [sic] Finding [sic] of Fact and Conclusions of Law ("Plaintiff's Findings") at 13).

Plaintiff adduced no evidence that even hints at discriminatory practices regarding promotions of Hispanics or other minorities. Quite the contrary, Hispanics and other minority members have received excellent appraisals and have been promoted by the NLRB in Region 29. Therefore, in addition to rejecting plaintiff's claim regarding the allegedly pretextual reasons for his discharge, I reject plaintiff's garbled assertion that he "has satisfied burden of persuasion [sic] that Region 29's employment practice of evaluating employees, who obtained their initial training at Region 29, were systematically denied promotions or terminated or both." (Plaintiff's Findings at 11).

■ *Disparate Impact.* To make out a prima facie case of disparate impact, plaintiff must identify "the specific employment practice that is challenged." *Watson* 487 U.S. at 994, 108 S.Ct. at 2788. After identifying the employment practice at issue, plaintiff must "show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* 108 S.Ct. at 2789.

■ Plaintiff has failed to make out a prima facie case of disparate impact. He identified no particular policy or practice in hiring, promotion, termination or the terms and conditions of employment which had an adverse impact upon minorities. He never even identified the minorities. There is simply no merit to the allegation that plaintiff was terminated because he is a Hispanic or a member of any other racial minority. To the contrary, his termination was based upon poor performance and his subsequent failure to improve when given the opportunity to do so. The evidence clearly shows that the NLRB attempted to help plaintiff improve as much as possible. The defendant demonstrated a legitimate business reason for discharging him: the plaintiff's poor performance.

■ Finally, even if plaintiff could have established liability, the fact remains that he did not pass the bar exam within fourteen months of his employment. Thus, the most he would be entitled to is two additional months of employment. For this period of time reinstatement would serve no purpose, and plaintiff never even sought to introduce evidence that he lost any income so that he would be entitled to back pay.

Plaintiff has simply failed to persuade the Court that a discriminatory reason more likely motivated his employer or that his employer's proffered explanation is unworthy of credence. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. In short, I find that plaintiff's race and color were not even the slightest factors in his discharge.

Accordingly, the clerk is directed to enter judgment for the defendant.

SO ORDERED.