**Rupert A. JEMMOTT, Plaintiff,**

v.

**CITY UNIVERSITY OF NEW YORK, Charles W. Merideth, Elizabeth Iannizzi and Thomas M. Carroll, Defendants.**

No. 92–CV–1564 (JMA).

United States District Court, E.D. New York.

Oct. 28, 1994.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff.

Oliver Koppell, Atty. Gen. of State of New York by Joel Graber, Asst. Atty. Gen., New York City, for defendants.

## MEMORANDUM AND ORDER

AZRACK, United States Magistrate Judge:

This proceeding was referred by consent to the undersigned for all purposes including entry of judgment, pursuant to 28 U.S.C. § 636(c) (1988 & Supp. IV 1992). Accordingly, I conducted a non-jury trial which ran from May 2 through May 5, 1994.

The issue presented at trial was whether plaintiff's discharge from his administrative post at the New York City Technical College was the result of race-based discrimination violative of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* For the reasons stated herein, I conclude that his dismissal was lawful.

## I. *FINDINGS OF FACT*

This case concerns a man who attempted with the best of intentions to achieve a higher good for the institution that employed him, and instead met with censure, public humiliation, and irreparable damage to his career. Dr. Rupert A. Jemmott, an educational administrator by profession and the plaintiff in this action, is an African–American man who was employed at New York City Technical College ("City Tech") of the City University of New York (CUNY) system from January 1987 until he was discharged on February 13, 1991.[1] In March of 1990, the college acquired a new president, Dr. Charles W. Merideth, who figures prominently in the history recounted below. President Merideth is also African–American.

Plaintiff was employed at City Tech at a time of financial hardship for the college, consequent to substantial budget cuts that were anticipated in the CUNY system. Indeed, President Merideth was instructed by his superiors to reduce the City Tech administration and trim vital services that had previously been available to the students and faculty. Accordingly, the President was engaged principally in seeking new sources of funding and reorganizing the institution, particularly its administration. Because the changes were expected to be painful and the President was new to the college, one of his foremost priorities was to muster as much support as possible from every important body therein especially the faculty and students. These two groups were of particular consequence, as both possessed the ability to seriously undermine any leadership of which they did not approve. For example, chronic student unrest had already wreaked considerable havoc at the college, and threatened to make it appear an unattractive employment prospect to teachers and administrators whom the President was trying to court. Further, the faculty possessed the ability to give the President a vote of no confidence, the effects of which would have been devastating and would likely have marked the end of his employment at the college. Consequently, the support of the students and faculty was essential to the success not only of the college, but also of its leadership.

Reductions in the college's administration were likely to involve reductions in the number of its employees covered by the Executive Compensation Plan (ECP), a vehicle the CUNY system had established to employ high-level administrative personnel. Indeed, during the period in question, President Merideth reduced the number of ECP slots at the college from seventeen to nine. Further, he changed the structure of the college administration, placing the Provost in a position of central authority and requiring the Vice Presidents who headed the particular departments to report to that person. Only through the Provost then would the Vice Presidents' concerns reach the President.

The success of this structure was extremely important to President Merideth as it left him free to do the work he felt was most vital to the future of City Tech: i.e. seeking new sources of funding and, most important, try-

---

1. A great deal of trial testimony was devoted to plaintiff's numerous qualifications for the posts he held at City Tech. Because defendants have not argued otherwise, I find that plaintiff was more than sufficiently qualified for the position from which he was discharged. Accordingly, I decline to record his impressive list of achievements herein.

ing to position the college as a central player in the CUNY system—and in the state over-all—a position it had not previously occupied. To ensure that the structure worked, the President continually indicated that he would not contradict his Provost—who during the relevant time period was Elizabeth Iannizzi—or reverse decisions she made that were appealed to him. Consistent with this policy, he emphasized the importance of teamwork among the administrators and expressed the hope that they would be able to resolve internal disputes among themselves without involving him. However, those who were accustomed to dealing directly with the President did not take kindly to the new structure, and on occasion it gave rise to conflicts.

Plaintiff's various positions at City Tech were covered by the ECP. Initially hired to fill the position of Associate Dean of Student Affairs, plaintiff was promoted twice: first to Acting Dean of Student Affairs in June 1990, and then again the following September to Acting Vice President of Student Affairs. Both promotions were executed by President Merideth. After each took effect, the prior position plaintiff had occupied was eliminated.[2]

In addition to receiving three promotions during the four years of his employment, plaintiff also received at least seven substantial salary increases, and by the time he was discharged was making $96,031.00 annually.[3] The last of these raises was granted in September of 1990. Further, at the time plaintiff became the Acting Vice President the college began to contemplate seeking an individual to fill the position on a permanent basis, and plaintiff was told that he would be eligible to apply for it. Indeed, approximately two months later and less than three months before his discharge, President Merideth informed plaintiff not only that it was appropriate for him to apply for the permanent position, but that there had been no

problems with his performance or management style that were likely to preclude him from being given serious consideration.

However, plaintiff's employment at the college was not free of troubles. The evidence indicates that he was unable to get along with at least two of his co-administrators: Evelyn Whitaker, an African–American woman who occupied the position of Vice President of Student Affairs when plaintiff first joined the college, and Elizabeth Iannizzi, a white woman who was serving as the Acting Provost at the time of his discharge. Further, students on the search committee for a permanent Vice President of Student Affairs expressed opposition to having him interview for the job, claiming that he was inattentive and insensitive to their problems.

Plaintiff's relationship with Provost Iannizzi was described as antagonistic by one of the trial witnesses, and he was said to show inadequate respect for her position as Provost. Plaintiff himself admitted at trial that he and the Provost "did not enjoy the best of interpersonal relationships," and that their troubles resulted for the most part from his frequent tendency to appeal her decisions to the President.

Only a few examples were given of their contentious interactions, and these are summarized briefly here. On at least two occasions plaintiff and Provost Iannizzi had nasty disagreements regarding expenditures plaintiff wished to make in the Department of Student Affairs, for which he could not obtain approval. During one of these encounters, he expressed doubts about the Provost's ability to do her job properly and implied that he could perform her duties better than she could. On another occasion, he stormed out of a meeting of the President's cabinet before being dismissed, slamming the door behind him. This particular incident was later cited by the President as an example of

2. Plaintiff was promised however, that he could return to the position of Associate Dean should he not be selected for the permanent post of Vice President.

3. Plaintiff's salary history is reflected in the following table:

| DATE | SALARY (ANNUAL) |
|------|------|
| 1/5/87 | $ 62,413 |
| 4/1/87 | 65,534 |
| 11/1/87 | 74,025 |
| 6/16/88 | 77,727 |
| 4/6/89 | 81,614 |
| 6/1/90 | 87,980 |
| 9/6/90 | 96,031 |

plaintiff's frequent expressions of disrespect for the Provost.

A third incident occurred during a meeting at which a marketing student's racially offensive mannequin display was being discussed. Two divergent accounts of this meeting were presented to the Court. Iannizzi remembered that the student who had complained of the display was raising his voice unnecessarily and that she asked him to lower it, when plaintiff shouted that she had no right to tell the student how to speak. Plaintiff recalled that Iannizzi had inappropriately reproached the student, telling him he was irresponsible for challenging the display. Regardless of whose account is correct, the confrontation was obviously keenly unpleasant.

The fourth struggle took place when plaintiff wanted to hire Bart Jones, a retiring faculty member, on a part-time basis to assist the preparation of the counselors in the Department of Student Affairs. When the Provost refused plaintiff's request he immediately appealed her decision to the President. The latter indicated a reluctance to undermine the Provost by reversing the decision, even though he found the idea viable.[4]

Plaintiff's disagreements with Whitaker, were typically characterized by a series of memorandum communications—copies of which always went to the President—even though the two worked right across the hall from each other. These scuffles were so visible and unpleasant that President Merideth, after repeatedly directing the combatants to work together, began to contemplate relieving both of their respective duties. Indeed, he went so far as to inform them that they might lose their jobs if they did not put their personal difficulties aside and begin functioning like members of the same team. However, upon learning that Whitaker intended to retire anyway, the President decided to accept her resignation and allow plaintiff to continue as head of the Department.

The events leading to plaintiff's discharge occurred within the Department of Student Affairs shortly after plaintiff was placed in charge of it, and eventually involved the Provost and President. An understanding of the import of these events requires some knowledge of the structure and atmosphere of the Department, which I will provide in brief.

The Department of Student Affairs oversees all non-academic student activities on the campus, and is responsible for ensuring that students' needs are met. During the period of plaintiff's employment it was comprised of the following units: admissions, financial aid, registrar, job placement, student support services, student life, counseling, and the SEEK program.[5] The latter two units, both of which provided academic and personal counseling to students, are of particular importance to this action. The counselors whose services they offered fell into two categories. The majority were members of the faculty, employed pursuant to a faculty contract which required that they be available on campus nine months out of the year and work thirty hours a week. This group, which incidentally was racially mixed, will be referred to herein as "faculty counselors." The remainder were generally so-called "HEOs" (Higher Education Office employees) who worked thirty-five hours per week the entire year, and were granted three to four week vacations. I will call them "non-faculty counselors."

The relationship between the faculty counselors and the administration of the Department of Student Affairs had always been tense and often even ugly. Indeed, the testimony of one white faculty counselor, Thomas E. Waber, indicated that serious discord existed not only during plaintiff's tenure but through many prior and subsequent administrations. These problems were rarely the

---

**4.** A subsequent event related to this particular incident was cited by plaintiff to illustrate what he alleged were Iannizzi's racist leanings. *See infra* at 405. After President Merideth denied plaintiff's appeal, a white administrator, Ron Holloway, made a similar request that a retiree be hired part-time in his department. When the Provost refused the request Holloway became argumentative and eventually caused the Provost to change her mind. When she did so, the President also changed his mind and allowed plaintiff to hire Bart Jones.

**5.** SEEK is a counseling program for educationally and academically disadvantaged students in the CUNY system.

result of direct contact between the faculty counselors and the Vice President, whose accessibility was kept at a minimum. Rather they arose from counselors' interactions with the directors of the counseling and SEEK units, who at the time plaintiff held office, were Charles Loveday and Victor Ayala respectively. However disputes between the administration and the faculty counselors generally concerned policies that had been established by the Vice President, and eventually involved the person occupying that post at the time.

Faculty counselors were likely to emerge victorious from clashes with the administration of the Department during the period of plaintiff's Vice Presidency. As faculty members they were in a position to muster support from the rest of the faculty, creating the potential for a faculty vote of no confidence against the leadership of the college. President Merideth's testimony indicated that he felt particularly threatened by this possibility, although the evidence did not generally permit a conclusion about whether his fear was typical. The behavior of the faculty counselors however, discussed more fully below, suggests that they were accustomed to getting their way, which in turn implies that Merideth was not the first President to fear losing their support. In any case, the attitude of the college's leadership at the time in question gave the faculty counselors great leverage when their interests came into conflict with those of the administration.

In view of their potential influence then, it is unfortunate that the testimony and evidence presented by both parties to this litigation managed, sometimes unintentionally, to cast serious doubt on the integrity of the faculty counselors. Even the defense witnesses could not deny that this group was unusually intractable, in possession of an ov-

erblown sense of entitlement, and given to squawking about concerns that can only be characterized as infantile. Their expression of indignation at being ordered to report to work two days earlier than their contracts required, so that the college could save money on the expensive process of registration, is a concrete example of their vocal self-indulgence and inflexibility. (*See infra* at 399, for a more thorough discussion of this incident.) Other examples abound in the account that follows. That people so unabashedly childish should be in a position to influence the leadership of a financially-strapped institution, dependent for its survival on the maturity and cooperation of all interested sectors, illustrated the potential pitfalls of employment at City Tech and placed the tragedy of plaintiff's fate there in high relief. Clearly the faculty counselors were not people who could be counted upon in a time of scarcity to make temporary personal sacrifices for the greater good. I can only hope that they are not representative of the entire City Tech faculty.

With that introduction, the circumstances surrounding plaintiff's discharge may be understood. On November 5, 1990 plaintiff received a memorandum from the faculty counselors outlining several of their complaints about the administration of the Department of Student Affairs. First, as described above, they resented being required to report to work for registration two days before their contracts required them to appear.[6] Second, they were indignant that two non-faculty counselors, Charles Loveday and Victor Ayala, had been placed in charge of units that had traditionally been held by faculty members.[7] Finally, they complained of disrespectful and threatening treatment at the hands of Department administrators— most likely the heads of the two counseling

---

**6.** It is worth noting here that in imposing this requirement, plaintiff had himself been complying with an order from above, which had been issued for the purpose of cutting costs.

**7.** Again it must be noted that the placement of non-faculty people in such positions had been effected as a cost-saving measure. Because the administration of the Department wished to provide counseling services for its summer students as well as during the regular school year, it

became necessary to have counselors available year-round. Once again, it was costlier to hire people for the summer months, or to pay faculty members additional salary to work during that time, than it was to simply place into the open positions people who had been previously hired to work the full year. For this reason, the Department had adopted a policy that favored replacing retiring faculty members with HEO and other non-faculty employees.

units, Charles Loveday and Victor Ayala—over the prior year. In the last paragraph of the memorandum they requested an opportunity to meet with plaintiff to discuss their concerns in more depth. The document was signed by sixteen faculty counselors—including Michael Waxman and John Hudesman, two white men who are important to the remainder of this account—and copies were sent to President Merideth and Provost Iannizzi.

Plaintiff asked Thomas Waber who was serving as his deputy at the time, to investigate the allegations. Plaintiff also met with a small group of faculty counselors himself. Then in a memorandum dated November 28, 1990 and sent to all the counselors in the Department—both faculty and non-faculty—and to the President and Provost, plaintiff expressed his intention to learn more about the faculty counselors' complaints in a meeting which he indicated would be held the following December 10. All counselors and the two unit heads, Ayala and Loveday, were invited to attend.

On December 10 plaintiff, Waber, Ayala, Loveday and Waxman arrived at the meeting. Waxman, who aside from Waber was the only faculty counselor present, arrived a few minutes after the others, looked around, and seeing no other faculty counselors, stated that he was not sure he was supposed to be there. The five waited almost half an hour for the others to arrive, and left when they did not. No one had bothered to inform plaintiff of their intention not to attend the meeting,[8] nor did they contact him afterwards to explain their absence.

Provost Iannizzi was subsequently informed that the faculty counselors wished to meet with plaintiff outside the presence of the other counselors in the Department.[9] She reported this state of affairs to the President, who directed her to speak to plaintiff about the situation and to instruct him to hold the requested meeting. She was told that if plaintiff refused, she was to call the meeting herself. The President explained to the Provost that he was concerned about the serious problems confronting the college—one of which was student unrest—and that he felt listening to the faculty counselors' complaints would contribute to maintaining peace on the campus.

Approximately two weeks later at a Christmas party held in the Financial Aid Office, Provost Iannizzi suggested to plaintiff that he meet with the faculty counselors alone as they had requested, for the sole purpose of listening to their concerns. Although she did not order him to hold the meeting, she stated clearly her desire that he do so. He responded that because the Department of Student Affairs was not structured along faculty versus non-faculty lines, he did not wish to imply that such divisions existed by holding a meeting of the kind that had been requested. He emphasized that he was perfectly willing to meet with the faculty counselors to discuss their concerns, but not in the absence of others whose responsibilities might be related to the topics under discussion.

It is clear to this Court that plaintiff was attempting to convey to all parties within his domain the message that they would be treated fairly, and that no group would receive special treatment or influence. The faculty counselors' request contravened this policy and put plaintiff in the position of having to choose between their satisfaction and the strong morale he was trying to create in the Department. In expressing his intention to avoid meeting with the faculty counselors alone, plaintiff indicated that he wished to adhere to his even-handed policy even if doing so was likely to incite the

---

8. Defense counsel offered two memoranda that the faculty counselors had allegedly sent to plaintiff and to Provost Iannizzi before December 10 indicating that they did not intend to go to the meeting. The President was allegedly sent a copy of the memorandum addressed to the Provost and both he and the Provost were alleged to have received copies of one sent to plaintiff. Plaintiff's counsel however, did not learn about either of these documents until a few days before trial. The defendants' failure to produce them during discovery is quite suspicious given that both should have appeared in the files of both the President and Provost.

9. In her testimony she indicated that she had been given this information in a memorandum, but did not indicate whether it was the same memorandum she had allegedly received before December 10. *See supra* note 8.

hostility of the faculty counselors. This choice was obviously inconsistent with the one the President had made, but I am willing to accept that Provost Iannizzi's comments at the Christmas party may not have been sufficient to inform plaintiff of the President's preference.

Nevertheless, subsequent events conveyed more than adequately the message that plaintiff was expected to comply with the Provost's request. Shortly after the encounter at the Christmas party, while plaintiff was in President Merideth's office discussing an unrelated matter, the President suddenly brought up the subject of the faculty counselors. He mentioned that the Provost was upset with plaintiff for disregarding her suggestion, and stated in no uncertain terms that plaintiff was to abide by her wishes.[10] Plaintiff again explained his reasoning and the conversation ended.

On January 25, 1991 Provost Iannizzi issued a memorandum to plaintiff and the faculty counselors inviting them to attend a meeting the following February 1 in the President's conference room. The memorandum indicated that the following items would be discussed at the meeting: the opportunities afforded the faculty counselors to provide input for the development of student services and programs, their "views and philosophy," and interpersonal issues. Plaintiff responded on January 30 with a memorandum addressed to the Provost (and copied to the President), which in strong terms implored her to allow the dispute to be resolved within the Department in accordance with the accustomed administrative mechanisms before any extraordinary action—like a meeting held by the Provost—was taken. He emphasized that the application of unusual measures, before the regular procedures had been allowed to run their course, would constitute a breach of administrative protocol that would seriously undermine his leadership. He further likened the situation to a

prior one in which the President himself had evidenced a preference for meeting with formally constituted groups rather than with specialized constituencies.

On January 31 Provost Iannizzi sent plaintiff a final memorandum—copied to the President—indicating that she and the President wanted the faculty counselors' concerns to be heard, and that they hoped plaintiff would hold the requested meeting. He was informed that if he did not do so the Provost would have no alternative but to call the meeting herself. In stating further that over three months had passed since the faculty counselors' first communication, the Provost appeared to opine that the departmental grievance mechanisms had had sufficient time to do their work. Finally, the memorandum expressed the concern that had informed the President's actions up to that time: that the prospect of monumental problems in the future required the administration to take all necessary steps to resolve internal conflicts and ensure a united front. It ended with the following sentence:

> "In the interests of the college, I hope you will reconsider, meet with and listen to the concerns of the counseling faculty."

Plaintiff responded that same day to the Provost's memorandum with a memorandum of his own which he attached to copies of all their prior correspondence relating to the matter, and copied to the President, to the faculty and non-faculty counselors, and to Loveday and Ayala.[11] In this memorandum plaintiff stated that he would not attend the February 1 meeting. He explained that because the items to be discussed affected all personnel in the Department of Student Affairs, he could not participate in good conscience. The last sentence of the memorandum was worded as follows:

> "I am, via copies of this memorandum, urging that each member of [the] counseling faculty seriously reflect on the issues

---

**10.** Whether the President said "You better do what your superior tells you to do" as he contends, or as plaintiff contends, jovially quipped, "You better do what the white lady tells you to do," the message was nevertheless clear. Plaintiff was expected to obey the Provost's order, no matter how gently administered.

**11.** This action, I must admit, was quite possibly as divisive as the request the faculty counselors had made.

involved and the impact of their participation in such a meeting."

This statement was later seized upon, by several faculty counselors and the Provost, as an example of plaintiff's threatening manner. I believe that this characterization is inaccurate. As explained above, plaintiff was attempting to convey to those under his supervision that he would address all problems in a fair and even-handed manner. The import of this statement then was to invite the faculty counselors to consider the divisive effect of insisting on a meeting that would exclude all non-faculty employees of the Department, so that the propriety of their placement in particular posts could be discussed. Plaintiff clearly hoped to impress upon the faculty counselors that their request had put him in an impossible position, and that granting it would leave the non-faculty counselors and unit directors feeling betrayed with respect to an issue that could potentially affect their livelihood.

On February 1 plaintiff did not attend the meeting Provost Iannizzi had called with the faculty counselors. The Provost, accompanied by Thomas Carroll, the Dean for Professional Staff, presided and took notes on the counselors' comments. According to her testimony, the Provost avoided naming individuals in these notes, as many claimed to have felt threatened by plaintiff's conduct. After the meeting was over the Provost recorded her impressions and recommendations in a memorandum to the President. The memorandum stated in general terms that the faculty counselors had complained of being prevented from contributing to or dissenting from departmental actions, of being threatened when they attempted to interact with the academic community, and of poor leadership in the SEEK and counseling units. It went on to say that plaintiff's actions had challenged the administrative structure the President had put in place,[12] undermined the atmosphere of cooperation the President had been trying to foster, and caused the faculty counselors who attended the meeting to fear repercussions. At the end of the missive, the Provost recommended that plaintiff be immediately removed from his position and that

John Hudesman, one of the faculty counselors who had failed to attend the December 10 meeting, serve as Vice President on an interim basis. It bears noting here that Hudesman is white.

In her testimony at trial, Iannizzi attempted to further justify the recommendation she had made in the memorandum to the President. She stated that her prior interactions with plaintiff had given her the impression that he was trying to circumvent her, and that his directive leadership style was threatening and suggested that he would follow through on his threats. Her decision that he had to leave the Department resulted, she claimed, from an accumulation of unpleasant encounters she had had with him, coupled with the intensity of the feelings expressed at the faculty counselors' meeting. These several factors convinced her that the situation could not continue, she alleged, and led her to recommend that plaintiff be ejected from the college permanently and entirely, without being transferred to another department or given any kind of interim position on the campus.

Both the memorandum and Iannizzi's trial testimony were oddly devoid of specific examples the faculty counselors had cited at the meeting, of conduct constituting the mistreatment of which they complained. Only one faculty counselor was said to have been threatened with charges of insubordination if she interacted with the Department of Academic Affairs. Further, at his deposition Michael Waxman testified that he had not heard anyone at the meeting make the charges Provost Iannizzi recorded in her memorandum. Specifically, he stated that he did not recall hearing anyone say they had been threatened, pressured or prevented from providing input. Nevertheless, at trial Iannizzi characterized the meeting as an outpouring of negativity directed at plaintiff, a gush of emotion so overwhelming that her recommendation of plaintiff's immediate and permanent removal was automatic. Dean Carroll corroborated Iannizzi's account, stating that the passionate anger being expressed was such that he felt guilty and remiss for not having noticed it before.

12. i.e. the requirement that all Vice Presidents report to the Provost and submit to her authority.

The truth is probably somewhere between the two extremes, though I might add, perhaps closer to Waxman's account than to Iannizzi's and Carroll's. The latter two are after all, parties to this litigation and, of all the defendants, bear the most devastating charges of racist motivation. *See infra* at 405–406. However, it is clear from the fact that they demanded the meeting in the first place, that the faculty counselors had burning complaints about plaintiff's administration. Because I have reached my conclusion on unrelated grounds, I do not attempt to locate that line between the two accounts where the truth lies.

On February 13, 1991 as plaintiff was scheduling a date to be interviewed for the permanent position of Vice President of Student Affairs, he was summoned to President Merideth's office. There, in the presence of Dean Carroll, the President requested plaintiff's resignation. He explained that plaintiff's failure to attend the February 1 meeting and general inability to respond to the Provost constituted insubordination and that the faculty counselors had had many complaints about him. Plaintiff, dumbfounded, refused to resign and the President responded that he would consequently have to fire him. Plaintiff then asked if this meant he was out on the street and when the President answered yes, stormed out of the office exclaiming that he planned to consult with a lawyer.

Dean Carroll followed the distraught plaintiff down the hall and invited him into his office for further discussion. Upon being shrugged off, the Dean took a moment to compose himself and then returned to President Merideth's office. The President then asked him what was normally done in such circumstances. As Carroll pointed out at trial, this question was difficult to answer because plaintiff's situation was somewhat unprecedented. Unlike most terminated administrators, he did not have a tenured faculty position to revert to in the event of discharge, and the two positions he had occupied before being promoted to the Vice Presidency had been eliminated. There were however several other accommodations that could be granted in place of a reverter posi-

tion, and Carroll listed them for the President. These included a position in another part of the college, a study leave, a leave of absence, or a temporary nominal position to hold until he found another job. The President instructed Dean Carroll to explore these options with plaintiff, while he checked with the Vice Chancellor to make sure they could be awarded where, as here, an employee had been dismissed for cause. The Vice Chancellor informed him that he was free to grant whatever accommodations he thought were warranted.

That same morning the President sent plaintiff a letter which contained the following words:

"As per our conversation this morning, I am relieving you of your duties as acting vice president for student affairs effective immediately. Please confer with Dean Carroll regarding your entitlements and any accommodations we can offer you to assist you during this transition period. I thank you for your service to City Tech and wish you every success in the future."

Later that day, responding to plaintiff's written request for the details of his dismissal, the President wrote him a memorandum which requested that he meet with Dean Carroll regarding the terms of separation.

These invitations never received a response. Instead plaintiff later demanded to speak with the President alone about the firing. However, his earlier indications that he intended to involve a lawyer in the matter had prompted the Vice Chancellor of Faculty and Staff Relations to direct both the President and Dean Carroll not to speak to plaintiff about the circumstances of the discharge. Indeed, the President had been instructed not to meet with plaintiff alone. Consequently plaintiff's request was denied and he did not otherwise contact Carroll or Merideth before instituting this lawsuit. He received severance pay after being removed from the college payroll.

President Merideth wasted no time informing all interested persons in the Department of Student Affairs of the action that had taken place. On February 13, just hours after the discharge, he called a meeting with his Executive Assistant Dorey Clay, the Pro-

vost, and the Department's nine unit directors, and told them that he had relieved plaintiff of his duties as Vice President. A few days later at another meeting all counseling personnel in the Department were informed that plaintiff had been terminated, and that John Hudesman would replace him on an acting basis. Three faculty counselors, exhibiting characteristic self-indulgence, cheered loudly at the news. At some point during the period between these two meetings, the lock on the main door to the Department of Student Affairs was changed. Although no one who testified accepted responsibility for the action, the weight of the evidence indicates it was done at the Provost's request. Then on February 21, seven days after the discharge, President Merideth circulated a memorandum to the college community, announcing Hudesman's appointment. The clear implication of this announcement, which stated that Hudesman would assume the Vice Presidential responsibilities effective immediately, was that the prior Vice President had been summarily discharged. Adding insult to injury, President Merideth also informed two of plaintiff's colleagues that he had been fired for insubordination.

Eventually the President appointed Dr. Narcisa Polonio, an Hispanic woman, to fill the permanent position of Vice President of Student Affairs. When Dr. Polonio left the college shortly thereafter, she was replaced by another Hispanic woman, Dr. Anisia Quinones.

Plaintiff explains his failure to accept the invitation to discuss accommodations with Carroll, as the result of two factors: his ignorance of the types of accommodations that could be offered, and the finality of the President's words, not only at the moment of discharge but in the February 13 letter itself. He argues that the last line of the letter confirmed the message he had received in the President's office that he had already been separated from the institution and that a temporary or alternate position was out of the question. He contends further that had President Merideth offered to talk instead of answering yes to plaintiff's question, whether he was "out on the street," the latter would have had an opportunity to learn more about possible accommodations. The President's failure to propose further discussions during that tense moment in his office, plaintiff asserts, is evidence that accommodations were not contemplated.

I find this argument unconvincing. First, at the time of the discharge the President had been at the institution less than a year and probably was unfamiliar with the normal procedures for terminating employees. Indeed, his question to Carroll about what was "normally done" in such circumstances is evidence of this lack of familiarity. Second, the scene in the office was unpleasant and all parties obviously wanted it to end—most of all plaintiff, who was the first to leave. It would have been reasonable for Merideth and Carroll to want to postpone discussions until plaintiff had had an opportunity to calm down. Furthermore, they could reasonably have expected plaintiff to wish to talk to them at greater length after the initial shock had worn off. Finally, the last line of the letter does not necessarily have the meaning plaintiff would ascribe to it. As Carroll pointed out in his testimony, "those are boilerplate words that are used in order to close a letter gracefully" and are not to be analyzed or taken literally. For these reasons, I find that plaintiff has not adequately explained his failure to pursue accommodations from the college. This failure is troubling not only in light of the two invitations he received from the President to do so, but also because he alone bore the responsibility to safeguard his own future. I cannot impose upon the college leadership the duty to concoct the best means of protecting plaintiff from the harmful effects of their decision, particularly when they very clearly made an avenue of relief available to him. Further, plaintiff's claim that he understood only that no accommodations were available to him, resembles too closely his claim that he did not understand the request by his superiors that he meet with the faculty counselors, to constitute an order rather than merely a suggestion. For these reasons then, I attribute the college's failure to grant plaintiff post-discharge accommodations solely to his failure to pursue them.

Plaintiff's argument that the President did not intend to grant him accommodations is crucial to his claim of race discrimination. It was part of an effort he made throughout the trial, to show that the circumstances of his discharge were unlike those of terminated white employees at City Tech and in the CUNY system in general, both in the manner of termination and the quality of accommodations offered. Plaintiff was able to show that in the six years since the ECP had been formed, he was one of a very few of its discharged employees to be fired effective immediately. Only one other man at City Tech, a Remo Mongiardo—who happened to be white—was removed from his position as Manager of Reprographics Services and, like plaintiff, simultaneously forced out of the college. A great many other administrators—most of them white—who lost their administrative positions remained at the college either in positions that had been specially created for them, or because they were demoted rather than being expelled completely, or because they had reverter rights. Further no one had suffered the indignity of having their discharge revealed by implication or otherwise. Generally, the college employed face-saving measures—announcements indicating that the person in question had expressed a desire to return to the classroom, to "go in new directions"—which created an appearance that the termination was at the request of the departing person, thereby removing the stigma of discharge. The absence of any attempt to protect plaintiff in this manner left the impression that he had done something truly horrible to deserve such extraordinary treatment.

The combination of these circumstances could reasonably incite suspicions of racial discrimination, such that a *prima facie* case of it is made out. *See infra* at 407–408. The case would be more convincing were it not, however, for the undisputed fact that all those who were granted accommodations and other protections had taken affirmative steps to obtain them. Further, plaintiff was the first ECP employee to be fired for insubordination, and the Vice Chancellor had to be consulted about the proper handling of such a situation. I believe in addition, that the President's failure to follow the usual procedures—particularly in informing affected personnel of the Department's new leadership—resulted from his lack of familiarity with the same rather than from racial motives. After all, he demonstrated substantial ignorance by asking Dean Carroll what those procedures were. Finally, it bears noting that summary discharge, though rare, was not unprecedented in the CUNY system, having been effected in at least two cases prior to the instant one. Of the two people fired in this way, one had been white and one Hispanic.

In addition to his showing that his treatment upon discharge had been substantially different from that of white terminees, plaintiff further attempted to show that a bias against African–Americans had been demonstrated in hiring and firing patterns at the college, particularly those of President Merideth's administration. Plaintiff pointed out, for example, that of the eleven people Merideth had appointed to ECP positions, only three were African–American and two Hispanic. Further, plaintiff attempted to argue that the President had removed only two people (plaintiff and Evelyn Whitaker), both of them African–American, from the ECP. This last allegation is simply untrue. At least one white administrator, Judith Walker, was removed from her post during Merideth's tenure, and five others—Frank Smith, Peggy Tirschwell, Herbert Flaig, Victor Strozak and Arnold Dimond—were demoted.[13] The list of ECP employees that plaintiff provided to this Court indicates that two others, Leroy Sparks and Barbara Costroff, resigned and returned to the classroom. No evidence has been offered about whether these resignations were required or not. However on the same list, a notation indicating that Evelyn Whitaker resigned to return to teaching, indicates that this record does not necessarily precisely document the circumstances of each departure. Therefore, it remains to my mind an open question whether Sparks and Costroff were forced to resign.

---

13. Since I have decided to consider demotions as part of this equation I must in fairness add that

Cheryl Smith, an African–American woman on the ECP was demoted in 1992.

As to the President's record appointing minorities to the ECP, I am not prepared to find that it demonstrates racial bias. The testimony at trial indicated that a person in Meredith's position has several protected minorities to juggle when he addresses the difficult task of hiring administrators. At CUNY, those minorities that must be adequately represented include not only the federally recognized protected classes (African–American, Hispanic, Asian, Native American, Jewish) but also a group that CUNY has decided to recognize—Italians. Therefore, although when answering to federal authority Merideth was not required to grant Italians special consideration, he was required to do so by his superiors at CUNY. He may have been attempting to respect this particular requirement when he appointed Elizabeth Iannizzi as Acting Provost, Emilie Cozzi to fill the permanent Provost position, and a third Italian as Associate Dean for Engineering Technology. Finally, it bears noting that the CUNY system in general and City Tech in particular, are not immune from suits brought by white employees for reverse discrimination. Indeed the parties to the instant action drew the Court's attention to two discrimination complaints brought against the City Tech administration by white claimants. One of these went into litigation, and the other is currently passing through the college's internal conflict-resolution mechanisms.

The evidence before the Court further indicated that President Meredeth and the university take and have always taken great pains to ensure that their affirmative action mandates are followed when any major appointment is made. When a position becomes available a search committee at the college advertises it through consortia like the National Organization for Equal Opportunity in Higher Education and the Hispanic Association of Higher Education that have special access to minority communities. Before interviews can proceed, the college's Affirmative Action officer must certify that the pool of available applicants represents women and minorities to the extent prescribed by the mandates. If it does, a certain number of names, usually three or four, are selected from the pool to be interviewed by the President. President Meredith indicated in his testimony that on at least one occasion he had sent the names that were given to him back to the search committee because all three applicants were white men.

Outside the context of the ECP, both sides presented abundant examples of, on the one hand, Merideth's preference for white employees and on the other, the extra effort he made to hire minorities to high-level positions. This evidence was confusing and inconclusive to say the least, and I have chosen to disregard it.

The above discussion indicates that in attempting to prove a pattern of racist employment practices at the college, plaintiff was undeterred by the fact that the President, who was making most of the hiring and firing decisions, was himself African–American. First as described above, plaintiff attempted to show that the President preferred white administrators. However, plaintiff's principal theory in support of his claim was that Provost Iannizzi was a racist who controlled the President's decisions. To prove her racist leanings, plaintiff relied on circumstantial and anecdotal evidence. Iannizzi was said, for example, to have berated a student for objecting to a racially offensive mannequin display, *see supra* at 396–397, and to have denied plaintiff's request to hire a retiree on a part-time basis just before granting a similar request by a white administrator. *See supra* note 4. Plaintiff further directed the Court's attention to a comment Iannizzi made on the witness stand as she attempted to describe a visit she made to Ghana in the 1960s. She had stated that she remembered with particular fondness, the respectfulness of the people there—a respectfulness which, plaintiff asserts, she may have been disappointed not to receive from him. In addition, plaintiff recalled for the Court Iannizzi's testimony regarding plaintiff's threatening leadership style and attempts to circumvent her, and her act of changing the lock on the door to the Department of Student Affairs. These acts and allegations, it was argued, demonstrate a fear that is "the essence of racial stereotyping." Finally plaintiff relied on the lay testimony of three witnesses, two African–American and one white, to the effect

that plaintiff could only have been fired out of racial animus. One of the African–American witnesses, Dorey Clay, the President's Executive Assistant, testified that Iannizzi had a lack of confidence in black people and that she had opposed Clay's appointment to the executive position.

In addition plaintiff presented evidence to support his theory that President Merideth was virtually under Provost Iannizzi's control. This evidence consisted mainly of testimony that the President was frequently late for or failed altogether to attend meetings of his own cabinet, and that he often deferred to the Provost's judgment, particularly when her decisions were appealed to him. Plaintiff argued that the lateness and absences were manifestations of a loss of control of the institution, which the President hoped to curb by handing over an inordinate amount of authority to the Provost. I must say that I find this part of plaintiff's theory unpersuasive. First, the President's failures to attend cabinet meetings, which the evidence indicates were not as frequent as plaintiff would have the Court believe, may be attributed to his involvement in fund-raising for the college—which often took him off-campus—and to the fact that his superiors were located in Manhattan. Moreover, the President consistently indicated from the moment of reorganization that he would stand behind the authority of his Provost, and this early and continuous expression of his intention precludes a conclusion that he effectively left her in charge of the college after losing control of it himself.

Plaintiff's theory however, is as follows. The faculty counselors never sought plaintiff's discharge. Their November 5 memorandum requested that he "investigate" (rather than "correct") the abuses of which they complained, implying that they thought he did not know about the misdeeds and consequently were not yet disposed to blame him. However at the February 1 meeting, Provost Iannizzi, operating under the burden of unjustified but fixed racial stereotypes, misconstrued—intentionally or unintentionally—the faculty counselors' complaints against the Department and the two unit heads, as complaints about plaintiff personally. She then attributed to him every misdeed that was alleged, in spite of the fact that he had had little or no daily contact with any of the counselors. Therefore, plaintiff asserts, the decision to recommend that he be fired came from Iannizzi alone and was prompted solely by her racial animus. Because she effectively "called the shots" at the college, her recommendation was adopted by the President with little reflection and no investigation.

This theory is interesting, but does not necessarily address all the concerns raised by the facts. First, it does not explain why three faculty counselors cheered when they learned of plaintiff's discharge. This display of emotion, however immature, suggests not only that some faculty counselors really had wished to see plaintiff fired, but also that the position of the group overall affirmed this desire and the expression thereof. Second, it would seem that meeting with the faculty counselors in person and learning about their concerns directly, would have resolved any uncertainties Iannizzi might have had about whether they were complaining about plaintiff or about others in the Department. If they did not mean to complain about plaintiff personally, then it would have been extraordinarily difficult either to misinterpret the clear import of their words, or to intentionally misrepresent their claims to the President, who would likely have had many opportunities to learn the truth. Third, attributing entirely to racial stereotypes all of the ill-will and apprehension Iannizzi may have directed toward plaintiff, ignores the effect of what both admitted was a history of strained and disagreeable interactions between them. Indeed, the four encounters described *supra* at 396–397 seem to me to present ample grounds for Iannizzi's feeling that plaintiff was trying to circumvent her, and even to justify her perception that he had a threatening manner. After all, any challenge to her authority presented the distinct possibility that she might be prevented from performing her professional duties sufficiently, a prospect that would have made anyone feel ill at ease.

Furthermore the President's own repeated explanations of the reasons for the discharge made scant reference to the events that oc-

curred at the faculty counselor meeting. Although he cited the faculty counselors' complaints later in these proceedings, he at all times emphasized plaintiff's insubordination in failing to hold the meeting as requested, and his overall failure to respond to and respect the Provost's authority. Indeed these were the reasons he gave plaintiff on February 13, 1991 when informing him of his termination. In addition, both Carroll and Iannizzi, in their testimony at trial, emphasized one of the reasons Iannizzi had given in the memorandum recommending plaintiff's dismissal: his inability to work in accordance with the team spirit they were trying to create in the administration.[14] This justification was not, as plaintiff contends, a new one concocted at the last minute when other reasons began to seem unpersuasive, but rather had existed from the moment the recommendation was made. Its appearance in the memorandum further indicates that the faculty counselors' expressions of displeasure with plaintiff and the Department were not the only factors motivating Iannizzi's decision to recommend as she did. For these reasons then, I find that plaintiff's insubordination and contentious interactions with the Provost and others in the City Tech administration, constituted the principal reasons for his discharge from the position of Acting Vice President of Student Affairs.

## II. CONCLUSIONS OF LAW

A violation of Title VII may be established by means of either the so-called "pretext analysis" adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), or the "mixed motives" analysis applied by the Second Circuit in *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Both methods are employed herein.

### A. Pretext Analysis

A pretext analysis of an unlawful termination claim proceeds in several phases, each of which involves a shift in the burden of proof. First, the plaintiff must establish by a preponderance of the evidence, a *prima facie* case of racial discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. He may do so by showing (1) that he belongs to a protected class, (2) that he was qualified for the position from which he was discharged, (3) that he was discharged, and (4) that the discharge occurred " 'in circumstances giving rise to an inference of racial discrimination.' " *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir. 1989); *see also St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Sousa v. Hunter*, 739 F.Supp. 756, 759 (E.D.N.Y. 1990). Establishment of the *prima facie* case creates a presumption that the employer unlawfully discriminated against the plaintiff in effecting the discharge. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. The effect of this presumption is to place upon the defendant the burden of producing admissible evidence that the termination occurred "for a legitimate, nondiscriminatory reason" and was not the result of unlawful discrimination. *Id.* at 254–55, 101 S.Ct. at 1094–95. "If the defendant carries this burden of production the presumption raised by the prima facie case is rebutted." *Id.* at 255, 101 S.Ct. at 1094–95. The plaintiff is then given the opportunity to demonstrate that the explanation offered is not the true reason for the dismissal but rather a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093. In other words, the plaintiff must show both that the reason given was false, and that discrimination was the real reason for the decision. *Hicks*, —— U.S. at —— n. 4, 113 S.Ct. at 2749 n. 4.

Plaintiff has easily met the four requirements for establishing a *prima facie* case. He is African–American and highly

---

**14.** The precise wording of the memorandum on this point was as follows:

"Vice President Jemmott's leadership style is not one I, as provost, can condone, especially since it seeks to *undermine the sense of family that you, as president, wish to encourage.*" (Emphasis ours.)

qualified for the position of Vice President of Student Affairs, as indicated by, among other things, the encouragement he received to apply for the permanent position. Nevertheless, he was discharged, and the wide disparity between the circumstances of his discharge, and those surrounding the terminations of many similarly placed white people are, as stated *supra* at 403–404, sufficient to give rise to an inference of racial discrimination. Defendants however met their burden of producing evidence that the termination occurred in the manner it did for legitimate reasons. As stated above, they presented testimony and evidence that plaintiff was fired for insubordination and a continuing inability to cooperate with Provost Iannizzi, whose authority the President plainly intended to uphold. Further, it was shown that upon recommending to the President that plaintiff be discharged, the Provost cited his refusal to participate as a member of the "team" the leadership had tried to create. The grounds for this charge are obvious. Plaintiff's admitted tendencies to contest the Provost's decisions, appeal them to the President, and visibly demonstrate his displeasure with her actions could reasonably have led to the conclusion that he was not a team player. Even if the Provost was mistaken in so characterizing plaintiff, this Court may not second-guess her determination. *Fahie v. Thornburgh,* 746 F.Supp. 310, 315 (S.D.N.Y. 1990) (an erroneous but honestly held conviction that a person is not a good employee is a legitimate ground for dismissal); *see also Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988) ("[T]he reasons tendered need not be well-advised, but merely truthful"). Finally, as stated above, the defense showed that plaintiff was the only discharged employee who did not pursue the accommodations that normally would have been available to him. He was not however, the only employee to be discharged summarily, either from City Tech or from other colleges in the CUNY system. These factors lead me to conclude that defendants have presented sufficient evidence of a non-discriminatory motive to rebut the presumption raised by plaintiff's prima facie case.

■ Plaintiff has not however, succeeded in convincing this Court that the reasons defendants offered for the dismissal were a pretext for discrimination. His first challenge to the charge of insubordination—that the President and Provost did not clearly characterize as an order, their request that he hold the faculty counselors' meeting—is particularly difficult to swallow. Plaintiff has pat explanations for his misinterpretations of no less than three communications he received containing this request. These are as follows: the conversation with the Provost at the Christmas party was in a social context and her expressed desire that he hold the meeting sounded more like a suggestion than an order; the President's statement that plaintiff should comply with the Provost's wishes was too jovial and light-hearted to be interpreted as an order; the assertion in the Provost's January 31 memorandum, that plaintiff's failure to hold the requested meeting would require her to hold it herself, suggested to him that he was not required to do so. The last two contentions absolutely defy commonsense. First the context of both should have communicated loud and clear that the action being requested was mandatory. The President made his allegedly jovial statement after communicating to plaintiff that the Provost was upset with him for disregarding her prior request. This allegation should have placed plaintiff on notice of the possible displeasure of the Provost, which in turn should have prompted him to immediately comply with her wishes. The memorandum clearly meant to emphasize that the Provost considered the meeting with the faculty counselors to be so important that she would drop whatever she was doing to hold it, if plaintiff could not be relied upon to do so. Such an obvious expression by a superior of the importance of a particular action can only signify that the action must be taken. Indeed, it was quite presumptuous of plaintiff to assume that the Provost's intention to ensure that the meeting was held, meant that he did not have to be there. This assumption implied that the Provost had nothing better to do than undertake plaintiff's duties for him when he chose not to perform them himself. Second, good judgment dictates that when a superior expresses

a desire to have an employee take some action, the latter's decision not to do so is a direct challenge to the authority of the former.

Plaintiff challenges the insubordination charge on another ground which I also find unpersuasive. He claims that because the faculty counselors were not penalized for their act of insubordination in failing to attend his meeting, he should not be punished for failing to attend theirs. This argument is more appealing than the one discussed above, but nevertheless must fail. The leadership of City Tech had determined that its best course of action was to be solicitous of the faculty and avoid alienating them, even if doing so required the sacrifice of other interests. The question whether such a policy was well-advised is unfortunately not within the province of this Court. It also was not a question committed to plaintiff's judgment. As an employee of the college he was expected to either operate in accordance with the judgment of his superiors or resign. Therefore, as unfair as it may have seemed to him, he was expected to take all necessary steps to ensure the cooperation and satisfaction of the faculty members within his jurisdiction. The fact that they were not punished for insubordination was simply irrelevant to the question whether he could be. As President Meredith testified, faculty members and other college employees were subject to different sets of rules, and as the head of the college he did not intend to change that practice.

Plaintiff has offered only weak challenges to the charge that he failed to honor the Provost's authority. With respect to the second confrontation described *supra* at 396, he alleges that he did not storm out of the meeting until after it had formally ended. His position on his treatment of Iannizzi at the meeting concerning the offensive mannequin display, is not clear. Moreover, he admits that he and the Provost had a difficult relationship and that much of the tension may be attributed to his tendency to appeal her decisions to the President. Therefore, plaintiff has not demonstrated that the charge of inadequate deference to the Provost was actually a pretext for discrimination.

Finally, plaintiff has not addressed the Provost's charge that he failed to cooperate with the team effort the college leadership was trying to establish. For all these reasons, I must find that plaintiff has failed to show that the alleged justifications for his discharge were false and masked a racially discriminatory motive.

## B. *Mixed–Motives Analysis*

██ Plaintiff asserts that application of the mixed-motives analysis set forth in *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir.1992) must yield a ruling in his favor. *Tyler* states that a plaintiff who wishes to make a "mixed-motives" case must prove at the outset that an illegitimate factor had a "motivating" or "substantial" role in the decision to dismiss him. *Id.* at 1181. Once he has done so the employer is given an opportunity to prove that it would have arrived at the same decision even absent the impermissible factor. *Id.*

As discussed *supra* at 405–406, plaintiff argues that Elizabeth Iannizzi essentially controlled the President at the time of the instant events, and that she influenced him to discharge plaintiff for racially discriminatory reasons that she did not reveal. Specifically, it is argued that Iannizzi, operating in accordance with her racial biases, misrepresented the events that occurred at the faculty counselors' meeting and used that misrepresentation as a basis for recommending that plaintiff be dismissed.

For the reasons given in the above discussion, I do not find this argument persuasive. To summarize briefly, I do not believe that Iannizzi's dislike of plaintiff can be attributed solely to racial animus, given the nature of their prior relations. Further, I am not convinced that she would have intentionally misconstrued the faculty counselors' complaints as directed at plaintiff, had they really been directed at the Department. The risks that the truth would be discovered were simply too great. A mistaken misconstruction was possible perhaps, but to my mind, was more likely to result from her own troubled interactions with plaintiff than from any racial bias. Nevertheless, I find it difficult to believe that Iannizzi misconstrued the faculty

counselor's complaints at all, despite Waxman's testimony that he did not hear the statements she alleged were made. At least three faculty counselors publicly exhibited a personal dislike of plaintiff at a meeting of the entire Department. Further, the failure of the entire group to appear at plaintiff's scheduled meeting on December 10, without notifying him in advance, reeks of personal hostility. Finally, in light of President Meredith's infrequent and cursory reference to the events Iannizzi reported to have taken place at the meeting, I do not believe they played a substantial role in his decision to fire plaintiff. The President was, I believe, motivated by the factors he emphasized: plaintiff's insubordination and unproductive relationships with certain of his superiors.

Even if plaintiff had demonstrated that racial discrimination played a motivating or substantial role in the decision to dismiss him, defendants have nonetheless convinced me that they would have reached the same decision solely for other legitimate reasons. The grounds for this conclusion are fully presented in the pretext analysis provided above.

\* \* \* \* \* \*

▮ Plaintiff's obvious integrity and profound dedication to his profession made this case extraordinarily difficult to resolve. I never doubted that he acted with the best interests of the college in mind, particularly in his dealings with the faculty counselors, whose perquisites and preferences had clearly become too expensive for the institution to bear. Nonetheless, plaintiff's actions, although motivated by noble considerations, unfortunately provided defendants with ample fodder for a strong defense against his charges of race discrimination. Had he not been insubordinate or a thorn in the side of the Provost, his case for discrimination would have been far more convincing. Then again, under those circumstances, he might never have been discharged.

Nevertheless, my own difficulty resolving the issues presented, combined with my sense that plaintiff does not command vast financial resources, leads me to conclude that he should not be required to pay the costs and attorneys' fees defendants incurred in litigating this action. I accordingly exercise my discretion to deny defendants' application therefor. *See Owens v. National Railroad Passenger Corporation,* No. 88 Civ. 3810 (BN), 1994 WL 455589, at \*12 (S.D.N.Y. Aug. 22, 1994) (denying prevailing defendant's request for attorneys' fees and costs in light of plaintiff's modest earning capacity and his sincere belief that he had been a victim of racial discrimination); *Wooten v. New York Telephone Co.,* 485 F.Supp. 748, 762 (S.D.N.Y.1980).

### *ORDER*

For the reasons stated herein, the Clerk is hereby ordered to enter a judgment dismissing plaintiff's claim of unlawful discrimination and indicating that the parties are each to bear their own attorneys' fees and costs.

SO ORDERED.